697 F.2d 1172
 30 Fair Empl.Prac.Cas. 889, 66 A.L.R.Fed. 937,
30 Empl. Prac. Dec. P 33,257
 Theresa Williams WRIGHT, individually and on behalf of all
others similarly situated; William Virgil Howell,
individually and on behalf of all others
similarly situated, Appellants,
v.
The OLIN CORPORATION, and United Paperworkers International
Union, Local No. 1971, AFL-CIO; United
Paperworkers International Union,
AFL-CIO, Appellees,
American Civil Liberties Union Women's Rights Project;
American Federation of State County and Municipal Employees;
Coal Employment Project; Coalition for the Medical Rights
of Women; Coalition for the Reproductive Rights of Workers;
Committee for Abortion Rights and against Sterilization
Abuse; Employment Law Center; Equal Rights Advocates;
International Chemical Workers Union; Oil, Chemical &
Atomic Workers International Union; Planned Parenthood
Federation of America; Reproductive Rights National
Network; Jeanne M. Stellman, Ph.D. and Mary Sue Henifin,
M.P.H.; United Automobile Aerospace & Agricultural
Implement Workers of America; United Rubber, Cork, Linoleum
& Plastic Workers of America; Women Employed; Women's
Legal Defense Fund; Equal Employment Advisory Council; The
Chemical Manufacturers Association; Lead Industries
Association, Inc.; and American Cyanamid Company, Amicus Curiae.
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Appellant,
v.
The OLIN CORPORATION, a Virginia Corporation; United
Paperworkers International Union, Local No. 1971,
AFL-CIO; United Paperworkers
International Union, AFL-CIO, Appellees,
American Civil Liberties Union Women's Rights Project;
American Federation of State County and Municipal Employees;
Coal Employment Project; Coalition for the Medical Rights
of Women; Coalition for the Reproductive Rights of Workers;
Committee for Abortion Rights and against Sterilization
Abuse; Employment Law Center; Equal Rights Advocates;
International Chemical Workers Union; Oil, Chemical &
Atomic Workers International Union; Planned Parenthood
Federation of America; Reproductive Rights National
Network; Jeanne M. Stellman, Ph.D. and Mary Sue Henifin,
M.P.H.; United Automobile Aerospace & Agricultural
Implement Workers of America; United Rubber, Cork, Linoleum
& Plastic Workers of America; Women Employed; Women's
Legal Defense Fund; Equal Employment Advisory Council; The
Chemical Manufacturers Association; Lead Industries
Association, Inc.; and American Cyanamid Company, Amicus Curiae.
 Nos. 81-1229, 81-1230.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 1, 1982.
Decided Dec. 23, 1982.
 
 Joel M. Cohn, Washington, D.C. (Deborah A. Reik, Michael J. Connolly, Gen. Counsel, Philip B. Sklover, Acting Associate Gen. Counsel, Vella M. Fink, Asst. Gen. Counsel, Washington, D.C., on brief), for appellants.
 Carin Ann Clauss, Washington, D.C. (University of Wisconsin Law School; Joan E. Bertin, American Civil Liberties Union Foundation, New York City, on brief), for amici curiae, American Civil Liberties Union Women's Rights Project, et al.
 Thornton H. Brooks, M. Daniel McGinn, Greensboro, N.C. (William P.H. Cary, Brooks, Pierce, McLendon, Humphrey & Leonard, Greensboro, N.C., William B. Dickinson, Labor Counsel, Olin Corp., Stamford, Conn., on brief), for appellee.
 Thompson Powers, Washington, D.C. (Ronald S. Cooper, Daniel C. Sauls, Steptoe & Johnson, Edmund B. Frost, Patrick C. Joyce, Washington, D.C., Standish F. Medina, Jr., Debevoise, Plimpton, Lyons & Gates, New York City, Donald C. Droste, Marilyn H. Martin, Wayne, N.J., on brief), for amici curiae The Equal Employment Advisory Council, the Chemical Mfrs. Ass'n, Lead Industries Ass'n, Inc. and American Cyanamid Co.
 Before PHILLIPS, MURNAGHAN and SPROUSE, Circuit Judges.
 JAMES DICKSON PHILLIPS, Circuit Judge:
 
 
 1
 These consolidated appeals were taken from judgments entered in favor of defendant Olin Corporation (Olin) in two employment discrimination actions consolidated for trial. In No. 81-1230, the Equal Employment Opportunity Commission (EEOC), pursuant to 42 U.S.C. Sec. 2000e-5(f)(1), had charged Olin with race and sex discrimination in its Pisgah Forest, North Carolina, plant in recruitment, hiring, job assignments and classifications, promotion, terminations, re-employment and in its seniority system. In No. 81-1229, Olin employees Theresa Wright and William Howell had raised similar claims in a class action partially certified by the district court.[1]
 
 
 2
 Over Olin's threshold jurisdictional objection, the district court reached the merits but then found for Olin on all the claims in both actions. On Olin's properly preserved jurisdictional objection we first hold that the district court had jurisdiction of all the race discrimination claims as to which challenges are presented on appeal. We next hold that though the district court did not have jurisdiction over all the sex discrimination claims in the EEOC action because they were not proven to be the subject of reasonable cause determinations, it did have jurisdiction over those claims--save for those related to hiring--as part of the properly certified Wright-Howell class action, so that they are properly before us for review on the merits.
 
 
 3
 On the merits, we affirm the district court's judgment in favor of Olin in all respects save one. On that issue, the district court determined that Olin's "fetal vulnerability" policy which restricts female access to jobs requiring contact with toxic chemicals was justified by sound medical evidence and instituted and maintained with no intent to discriminate on the basis of sex. We vacate that portion of the judgment and remand for further factual development of the fetal vulnerability issue under controlling legal principles that we hold were not properly applied by the district court.
 
 
 4
 * In addition to defending its favorable judgment on the merits as to all claims, Olin as appellee brings forward its general objection to the jurisdiction of the court below to entertain most of the claims made in the agency action. We first address that jurisdictional objection.
 
 
 5
 Because the plaintiffs have not challenged all the merit determinations, we consider the jurisdictional objection only with respect to those that are challenged. These are race discrimination in a) denial of training and entry into craft positions, b) maintaining a seniority system with a disparate impact on blacks, c) refusing to promote to foreman positions, d) extending probationary periods, and e) discharging during probation; and sex discrimination in f) refusing to hire women applicants, g) maintaining sex-segregated departments and jobs, h) denial of training and entry into craft positions, i) maintaining a seniority system with a disparate impact on women, j) refusing to promote to foreman positions, and k) extending probationary periods.
 
 
 6
 We discuss them separately.
 
 
 7
 * The parties to the EEOC action stipulated that more than 50 discrimination charges--including charges of race and sex discrimination in hiring, classification, seniority, and discharges--had been filed with the EEOC against Olin. The EEOC complaint does not stray beyond the jurisdictional limits originally set by this broad array of charges. But these limits are not the only ones to be considered under the jurisdictional requirements of 42 U.S.C. Sec. 2000e-5(b). In addition, for each type of discrimination alleged in the complaint the EEOC must have made a reasonable cause determination and attempted conciliation between the employer and employees. See EEOC v. General Electric Co., 532 F.2d 359, 366 (4th Cir.1976). These latter two requirements are also essentials in the statutory jurisdictional scheme.
 
 
 8
 Whether a particular claim has been sufficiently identified in a reasonable cause determination and sufficiently conciliated for jurisdictional purposes may not be readily apparent from the record. Fair notice to the parties is the key consideration where--as here--jurisdiction is disputable. See EEOC v. American National Bank, 652 F.2d 1176 (4th Cir.1981), cert. denied, --- U.S. ----, 103 S.Ct. 235, 74 L.Ed.2d 186 (1982). Taking fair notice as the determinant, we find it sufficiently revealed on the record as to some of the claims, but not as to others.
 
 
 9
 We first conclude that jurisdiction did not exist in the EEOC action as to any of the major sex discrimination issues. The record is virtually devoid of direct evidence that any of these was the subject of a reasonable cause determination. To bridge the evidentiary gap, the EEOC relies on stipulation # 4 between the parties. This stated that "[t]he Commission has complied with the administrative and procedural requirements of Title VII material to this action and with all conditions precedent to bringing this action."
 
 
 10
 We cannot hold that this vague and conclusory stipulation suffices to establish jurisdiction over all the discrimination claims in the agency action.[2] While jurisdictional "facts" may certainly be stipulated with binding effect, subject matter jurisdiction cannot be conferred by consent, whether by "stipulation" or otherwise. Whether a particular stipulation was intended to do the one or the other may pose a difficult question--as does this one. But to treat this one as effectively establishing the existence of the requisite jurisdictional facts--i.e., that a reasonable cause determination was made as to all the agency action claims--would require that we make assumptions not compelled by its language and indeed now challenged by one of the parties to the stipulation.
 
 
 11
 Imprecise, conclusory stipulations of this type are poorly conceived means for settling disputable questions of jurisdictional fact. Where, as here, their intent to stipulate the existence of the requisite facts--as opposed to "waiving" the necessity that the facts exist or to consenting as a matter of law to jurisdiction--is not manifest from the language and is challenged by one of the parties, courts have no recourse but to search the record for independent evidence of those facts' existence.[3]
 
 
 12
 Looking to that record, unaffected by the stipulation, we find first that it affirmatively discloses reasonable cause determinations and conciliation efforts in respect of five charges of racial discrimination in hiring, job classification, promotion, seniority, and sex and race discrimination in rehiring.[4] A reasonable cause determination and conciliation on these issues was sufficient to allow the EEOC to bring suit on the race discrimination issues outlined in a) through e) above.[5] It was insufficient to give the court jurisdiction over the sex discrimination claims outlined in f) through k).[6]
 
 B
 
 13
 The EEOC contends that, even if the court had no jurisdiction over some of the claims asserted in its action, the underlying issues in those claims were properly before the court in the Wright-Howell class action, and are therefore properly before us on appeal. Since we have determined that all the race discrimination issues presented on appeal are properly before us in the EEOC action, we do not analyze the Howell sub-class involving parallel race discrimination claims, but only analyze the Wright sub-class involving sex discrimination claims.
 
 
 14
 Theresa Wright filed a charge with the EEOC in July 1976, alleging that she and other Step-2 operators, an entirely female job classification, were unlawfully denied promotions and seniority.[7] After receiving a right-to-sue notice on May 2, 1979, she filed a class action complaint the next day alleging a broad array of sex discrimination including all those claims now presented for review on this appeal.[8] She later moved for class certification, seeking to represent all female employees or applicants for employment at Olin since 1971. The district court denied such a broad class certification, reasoning that she was an improper representative for unsuccessful applicants for employment or for illegally terminated employees, citing Hill v. Western Electric Co., 596 F.2d 99 (4th Cir.1979). However, the court also rejected Olin's contention that Wright could represent only a single department or job classification. It then certified Wright as a class representative of all female hourly employees at Olin since 1976
 
 
 15
 who have allegedly suffered sex discrimination by reason of denial of seniority or advancement or such discrimination stated in the charge filed by her or developed in the course of a reasonable investigation of such charge.
 
 
 16
 Neither side has appealed the appropriateness of the class certification, so we are left only with determining its actual scope. Clearly, the class does not include non-hires, so the action did not include the issue of sex discrimination in hiring. Equally clearly, the class action included all claims relating to the denial of advancement or seniority. The plaintiffs attempted to show that Olin restricted women to less desirable jobs and lines of progression in a pervasive effort to limit advancement or seniority. This was sometimes done, alleges Wright, relatively openly as with the all-female Step-2 operators or with the female protection and fetal vulnerability program. In other cases, says Wright, it was done more covertly but equally discriminatorily. Given the alleged pervasive discrimination in job assignments and advancements, we think the certification covered all the issues raised on appeal involving restrictions or limitations on women's access to certain jobs whether by way of assignment, promotion or seniority.
 
 
 17
 The district court consolidated for trial the EEOC action and the Wright-Howell class action, and all issues in the actions as then structured were fully litigated and determined by the district court. In its separate memorandum and order for the Wright-Howell class action, the court made only three findings relevant to the Wright sub-class claims of sex discrimination: that any differences caused by the seniority system were not the result of intentional sex discrimination, that sex played no part in Olin's denial of seniority to Step-2 operators, and that female employees were promoted without regard to their sex. In the first and third of these findings, the court referred generally to its findings in the EEOC action filed contemporaneously. Obviously, the court intended by this, as is permissible in appropriate circumstances, that its findings in the EEOC agency action be used to amplify the findings in the Wright-Howell class action.
 
 
 18
 We therefore conclude that because all of the sex discrimination issues sought to be presented by plaintiffs on appeal--except those related to hiring--were properly pleaded in the class action complaint, were included in the class action as certified by the district court, and were then fully litigated and determined, they are properly before us on appeal, along with the race discrimination issues. We now turn to the disposition of the various claims on the merits.
 
 II
 
 19
 * The collective bargaining agreement between Olin and the union calls for a line seniority system. The plaintiffs challenged this system as having a disparate impact on blacks and females by locking them into undesirable jobs and departments. Olin denies that the seniority system has this disparate impact and asserts that, in any event, the system is protected under Sec. 703(h) of Title VII as a "bona fide seniority system."
 
 
 20
 American Tobacco Co. v. Patterson, 456 U.S. 63, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982), held that Sec. 703(h) applies to systems adopted either before or after the enactment of Title VII. We need not address, therefore, the plaintiffs' argument that Sec. 703(h) does not apply since Olin's seniority system was enacted, in their view, in 1968. The important question is whether this seniority system is bona fide.
 
 
 21
 The district court found that, despite modifications in 1968 and 1971, the basic principles underlying Olin's seniority system have been in effect since 1942; that the system is rational and in accord with paper industry practice and NLRB appropriate unit determinations; that it applies equally to blacks, whites, males and females; and that it was instituted, maintained and administered free of any purpose or intent to discriminate against blacks or females. These findings are not clearly erroneous.[9] Without undertaking a general analysis of all the factors that might be relevant in determining whether a seniority system is bona fide, we conclude that the system here, as evaluated by the district court, is so similar to the one upheld in International Brotherhood of Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), that the court did not err in concluding it was protected by Sec. 703(h). See Teamsters, 431 U.S. at 355-56, 97 S.Ct. at 1854-55.
 
 B
 
 22
 In addition to their general challenge to Olin's seniority system, the plaintiffs challenge a specific instance where Olin refused to grant Step-2 slitter operators seniority increases equivalent to Step-3 operators after changes in the machinery made the two jobs equivalent. In the 1972 collective bargaining negotiations, Step-2 operators, all female, were granted protection at their request from the heavy lifting required of Step-3 operators (50% female) behind the slitter machines. In 1976, the heavy-lifting work was eliminated and Olin began paying all slitter operators uniformly. Olin also offered Step-3 seniority to Step-2 operators, but after the union complained that this would infringe on accrued seniority rights of existing Step-3 workers, Olin retracted the offer. The district court found Olin acted in good faith with no intent to discriminate against Step-2 operators because they were female and concluded that Olin had not violated Title VII by withholding retroactive seniority dates. These findings are not clearly erroneous and support a conclusion of no disparate treatment based on sex.
 
 C
 
 23
 It follows from a finding that Olin's seniority system is bona fide that the plaintiffs' charge that Olin improperly maintained sex-segregated jobs and departments must fail. The statistics overwhelmingly showed that the percentage of women employees varied dramatically among departments and that most of the highest-paying departments were predominantly male. Olin's basic response to this prima facie showing of disparate treatment--a response that the district court accepted as a valid explanation--was that it invariably awarded all assignments, promotions and transfers to the most senior person bidding for the job vacancy. An expert witness offered by the plaintiffs attempted to rebut this explanation by testifying there was no significant difference between males and females with respect to seniority when bidding into departments--but he acknowledged that statistically insignificant differences in seniority could affect placement results. The plaintiffs produced virtually no evidence that Olin substantially deviated from the seniority method of assigning jobs.[10] Since we have already upheld the district court's finding that the seniority system is bona fide, it follows that Olin, by following its seniority plan, did not discriminate in its job assignments.
 
 D
 
 24
 Olin does not use a strict seniority rule when making promotions to foreman or relief-foreman positions or when selecting candidates for its craft-maintenance-apprenticeship program (MAP), but rather uses seniority along with other relatively subjective factors. Such subjective ratings systems have a clear potential for abuse and may hide race or sex discrimination. See Brown v. Gaston County Dyeing Machine Co., 457 F.2d 1377 (4th Cir.1972). The district court found here, however, that the promotions policies were applied fairly and without regard to sex or race. Specifically, it found that Olin promoted and selected blacks and women commensurate with the proportions of blacks and women seeking the positions. It is true that very few blacks or women applied for these positions. The record reveals 1967 job descriptions restricting many craft maintenance jobs to males.
 
 
 25
 The plaintiffs urge that this evidence, in addition to the low number of applicants, indicates that blacks and women were "chilled" from applying for these jobs. However, plaintiffs attempting to go behind statistics showing that a company places a proportionate number of blacks or women applying for the position must prove by a preponderance of the evidence that members of the protected group did not apply because they knew it would be a futile act. The plaintiffs here elicited testimony that it was well known the MAP had no blacks or women, but the district court found that no employee had ever filed a charge with the EEOC alleging he or she had been rejected from the program because of race or sex. Olin produced considerable evidence that the 1967 male-only job descriptions were outdated and not followed. The EEOC introduced no direct evidence that blacks or women were chilled from applying for foreman or relief foreman. We do not find clearly erroneous the district court's ultimate finding that Olin admitted employees to the MAP or promoted them to foreman or relief foreman on an equal and non-discriminatory basis.[11]
 
 E
 
 26
 The plaintiffs also challenge Olin's disproportionate extensions of probation periods for blacks and females and disproportionate discharge of black probationary employees. The district court found that Olin granted extensions of probation in order to give the employee an additional period in which to prove his or her ability to perform adequately. Olin awards an employee who successfully completes the probation period seniority as of the original date of employment. Thus, as the district court indicated, extensions of probation may not reflect any discrimination at all. In any event, Olin offered valid reasons for 3/4 of the 94 instances of probationary extension, and the plaintiffs offered no evidence that the reasons were pretextual (Olin had no available data for the other instances). Olin explained the higher discharge rate for black probationary employees as being due to higher absenteeism. The district court's finding that the discharge rate of probationary employees is consistent with their absentee rates, based on the documented absentee rates of non-probationary employees, is not clearly erroneous.III
 
 
 27
 We turn now to the claim related to Olin's "fetal vulnerability" program.
 
 
 28
 * The details of this program's initiation and of its operation were established without dispute at trial. In February 1978, after some four years of planning, Olin adopted its "female employment and fetal vulnerability" program which created 3 job classifications. 1) Restricted jobs are those which "may require contact with and exposure to known or suspected abortifacient or teratogenic agents." Fertile women are excluded from such jobs. Any woman age 5 through 63 is assumed to be fertile and can be placed in a restricted job only after consulting with Olin's medical doctors to confirm the woman cannot bear children and will sustain no other adverse physiological effects from the environment. 2) Controlled jobs may require very limited contact with the harmful chemicals. Pregnant women may work at such jobs only after individual case-by-case evaluations.[12] Non-pregnant women may work in controlled jobs after signing a form stating that they recognize that the job presents "some risk, although slight." Olin encourages women in controlled jobs to bid for other jobs if they intend to become pregnant. 3) Unrestricted jobs are those which do "not present a hazard to the pregnant female or the fetus." They are open to all women.
 
 
 29
 There are approximately 265 job classifications in Olin's Pisgah Forest plant. At the beginning of the fetal vulnerability program, twelve jobs were placed in the restricted category[13] and a significant number were classified as controlled jobs. At least five of the eleven lines of progression in the film division are affected by the policy. As required under OSHA regulations, Olin orally warns its male employees about lead exposure at the Pisgah plant, but the warnings are much less formal than the written warnings to women. No actual restrictions are placed on male employees.
 
 
 30
 The only evidence going to the purpose and the felt necessity for the program was provided by the oral testimony of three Olin employees. Dr. O'Connell, Corporate Director of Health Affairs, and a medical doctor, testified that Olin's Department of Hygiene and Toxicology reviewed the medical literature and concluded that the program was necessary,[14] essentially to protect the unborn fetuses of pregnant women employees from the damaging toxic effects of certain chemicals, principally lead, used in the manufacturing process to which the women were exposed. A further consideration, apparently secondary, was the danger from the same source to the pregnant employee herself. Dr. O'Connell could not name the articles or journals which supported this medical conclusion.
 
 
 31
 Fletcher Roberts, Director of Safety Loss Prevention at Pisgah Forest, not a medically trained person, testified that the company had measured the actual exposure levels at the Pisgah plant and had rejected alternatives, such as substituting non-toxic materials or improving ventilation or personal protective equipment, as being infeasible. The third witness, Dr. Ryan, Group Medical Director at the Pisgah Forest plant, testified that though he had not been consulted during the program's development and was not familiar with any research done before its implementation, he agreed with the "basic policy." None of these witnesses was qualified or testified as an expert in any relevant scientific or medical field.
 
 
 32
 Relying directly upon the testimony of these three witnesses, the district court made critical findings of fact against the claimants. The central finding was "that the policy was instituted for sound medical and humane reasons ... not ... with the intent or purpose to discriminate against females because of their sex ... [but with] the purpose ... to protect the unborn fetus."[15] On this basis the court concluded as a matter of law that the policy "does not discriminate against females in violation of Title VII."
 
 
 33
 This appeal of course challenges these specific rulings, and our review properly centers upon them.
 
 B
 
 34
 The first problem is to put the rulings in the proper conceptual framework for analysis. The parties are in hopeless conflict on this fundamental point.[16] Because that conflict reveals the essence of the problem, we summarize the opposing contentions in some detail.
 
 
 35
 Olin contends that the proper analytical framework is that developed for assessing claims of disparate treatment in McDonnell Douglas v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny. Within that framework, the argument runs, the district court's rulings are supportable under principles most recently explained in Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Under Burdine, says Olin, the purpose of the program as "articulated" by its witnesses sufficed as a "legitimate nondiscriminatory reason" to rebut any prima facie case of sex discrimination established by proof of the program's existence and intended operation. Because this reason was not then proven by the claimants to have been pretextual, the district court properly determined that intentional discrimination had not been established under the Burdine analysis. This determination, says Olin, properly disposed of the claim without need to assess it under other theories.
 
 
 36
 On the other hand, claimants contend that the undisputed evidence of the program's intended operation, with its manifestly adverse effect upon the employment opportunities of women only, established a prima facie case of overt, intentional discrimination. To such proof, say claimants, the McDonnell Douglas proof scheme, concerned as it is only with inferential proof of covert intention, simply does not apply. Evidence of such an overtly intended discriminatory effect may not be rebutted by any amount of proof of gender-neutral or even benign purpose or motivation underlying it. A prima facie case of this kind may only be overcome by establishment of the narrow, statutory b.f.o.q. defense specially provided by Sec. 703(a) of Title VII, 42 U.S.C. Sec. 2000e-2(a). Here that justification defense, an affirmative one as to which the defendant-employer had the burden of persuasion, was not established in evidence. Hence, say claimants, the district court erred as a matter of law in failing to find Olin in violation of Title VII on this claim.
 
 
 37
 Alternatively,[17] claimants contend that if the fetal vulnerability program is construed--as arguably they concede it might be--as a "facially-neutral" policy based upon the potential for pregnancy, mere proof of its existence and implementation established a prima facie case of disparate impact under Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), and its progeny, particularly Nashville Gas Co. v. Satty, 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977). Such a prima facie case may only be overcome by establishment of the judicially developed business necessity defense. This justification defense, like the b.f.o.q. defense an affirmative one as to which the defendant-employer bore the burden of persuasion, they argue was not established on the evidence here. Hence, say claimants, on this alternative theory as well, the district court erred as a matter of law in failing to find Olin in violation of Title VII.
 
 
 38
 In any event, claimants contend, the district court erred as a matter of law, and Olin persists in the error on appeal, in treating this claim as one properly assessed only as one of covert "disparate treatment" which was sufficiently rebutted and not re-established by proof of pretext under the McDonnell Douglas proof scheme. For this reason, the argument runs, the district court's rejection of this claim on that basis without assessing it under other theories reflects a misapprehension and misapplication of controlling legal principle. Claimants urge that this requires at least a vacation of this portion of the judgment and a remand for new trial under properly applicable principles.
 
 
 39
 Faced with these conflicting and alternatively advanced contentions, we note at the outset that the problem of fitting the fetal vulnerability program into the appropriate theory of claim and defense as developed in Title VII litigation is one of first impression with this court and--we are advised--with any court of appeals. We therefore approach it as an open one.
 
 
 40
 We must start by conceding that the fact situation it presents does not fit with absolute precision into any of the developed theories. It differs in some respects--either in its claim or defense elements--from each of the paradigmatic fact situations with which the different theories have been centrally concerned. This of course accounts for the conflict on the point between the parties.
 
 
 41
 That there would be such fact situations in Title VII litigation has always been recognized by the Supreme Court as it has developed and applied the different theories. The Court has continually admonished,[18] and indeed demonstrated in its own decisions,[19] that these theories were not expected nor intended to operate with rigid precision with respect to the infinite variety of factual patterns that would emerge in Title VII litigation. So has this court. See, e.g., Burwell v. Eastern Air Lines, Inc., 633 F.2d 361 (4th Cir.1980) (en banc), cert. denied, 450 U.S. 965, 101 S.Ct. 1480, 67 L.Ed.2d 613 (1981).
 
 
 42
 Furthermore, as is well established, it is often appropriate to assess particular Title VII claims and defenses alternatively under different theories. See, e.g., Furnco Construction Corp. v. Waters, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978); Wright v. National Archives & Records Service, 609 F.2d 702 (4th Cir.1979) (en banc). This simply reflects the general procedural principle that in Title VII litigation, as in other civil cases, parties may not be forced to elect between theories but may, within substantive limits, advance and are entitled to have considered alternative and even inconsistent theories. See Fed.R.Civ.P. 8(e)(2).
 
 
 43
 Where, as here, a particular fact situation might arguably be assessed under different theories, and where the different theories might yield different results, a choice between the different theories may of course finally be forced upon the courts. In such a case, the proper course is to seek guidance in the general principles underlying Title VII which the special theories of claim and defense were all designed to serve, and to stay as near as may be within developed doctrine for the sake of maintaining its stability and predictability.
 
 
 44
 With these points in mind, the McDonnell Douglas disparate treatment proof scheme[20] is immediately revealed to be wholly inappropriate for resolving the legal and factual theories of claim and defense centered on the fetal vulnerability program. Turning to the overt sex-discrimination/b.f.o.q. theory of claim and defense and the disparate impact/business necessity theory, we conclude that the latter is best suited for a principled application of Title VII doctrine to the fetal vulnerability program.[21]
 
 
 45
 The factual claim and defense actually advanced here by the parties find their closest parallel in the paradigmatic fact pattern out of which this theory of claim and defense evolved. That pattern involves "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." Teamsters, 431 U.S. at 336 n. 15, 97 S.Ct. at 1855 n. 15.
 
 
 46
 While the "facial neutrality" of Olin's fetal vulnerability program might be subject to logical dispute, the dispute would involve mere semantic quibbling having no relevance to the underlying substantive principle that gave rise to this theory. That principle, one of profound importance in the evolution of Title VII doctrine, has as its critical feature the consequences of employment policies rather than the "neutrality" with which the policies happen to be formally expressed. Its essence is that disproportionate consequences of an employment practice, even if unintended or indeed benignly motivated, may, like intentional invidiously discriminatory employer actions, constitute violations of Title VII. See id.
 
 
 47
 While the principle was first recognized in a context where as a matter of formal expression the challenged practice happened to be "facially neutral" in the most obvious sense of the term, see Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) (hiring test), it has long been applied as well to policies whose "facial neutrality" was only superficial in view of the palpable correlation between the gender of employees and its manifest consequences. See Nashville Gas Co. v. Satty, 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977) (no seniority accumulated during maternity leave).
 
 
 48
 That is exactly the situation here, where a policy, though literally expressed in gender-neutral terms, has as its obvious and indisputably intended consequence the imposing upon women workers of a "substantial burden that men need not suffer." Id. at 142, 98 S.Ct. at 351. As the Satty Court unhesitatingly applied disparate impact theory to the factual situation there presented, so should it be applied here to the generally comparable situation. See also Burwell v. Eastern Air Lines, Inc., 633 F.2d 361 (4th Cir.1980) (en banc) (mandatory pregnancy leave), cert. denied, 450 U.S. 965, 101 S.Ct. 1480, 67 L.Ed.2d 613 (1981); Mitchell v. Board of Trustees of Pickens County School District A, 599 F.2d 582 (4th Cir.) (mandatory non-renewal for pregnancy), cert. denied, 444 U.S. 965, 100 S.Ct. 453, 62 L.Ed.2d 378 (1979); Pennington v. Lexington School District 2, 578 F.2d 546 (4th Cir.1978) (denial of reinstatement following pregnancy leave).
 
 C
 
 49
 With the disparate impact/business necessity theory of claim and defense identified as the appropriate one to apply in resolution of the fetal vulnerability issue, the next problem is the proper way to apply it at this point in the litigation.
 
 
 50
 So far as the record reveals, its possible applicability was not considered by the district court.[22] As earlier indicated, a plausible assumption is that the court accepted Olin's argument that the case was properly assessed only as one of covert disparate treatment and on that basis found the claimants' proof insufficient to prove the requisite intent to discriminate against women. On that view of the case, there was of course no reason to consider whether any justification defense might also have been established.
 
 
 51
 As our earlier discussion has anticipated, we hold this assessment to be erroneous as a matter of law. Controlling legal principles were misapplied in several critical respects. Most importantly, the assessment failed to take into account that irrespective of Olin's specific intent or motive in adopting and implementing this employment policy, the policy's indisputably adverse effect upon women's employment opportunities while not touching those of men constituted a violation of Sec. 703(a)(2) of Title VII, Nashville Gas Co. v. Satty, 434 U.S. at 142, 98 S.Ct. at 351, unless the policy could be objectively justified under the business necessity theory of defense.
 
 
 52
 We therefore hold, in line with our earlier discussion of this theory of recovery, that the evidence of the existence and operation of the fetal vulnerability program established as a matter of law a prima facie case of Title VII violation. That leaves the question of how the relevant business necessity defense should now be applied at this stage in the litigation.
 
 
 53
 Claimants urge that we should apply it on this appeal--though presumably the application would be one of the first instance--and hold as a matter of law that the defense was not established on the evidence. Since Olin as defendant had the burden and the opportunity to attempt to establish it, this could be done. But we are not disposed to take this course.
 
 
 54
 Though the evidence adduced on trial would not suffice to support a finding of business necessity as we think it should be applied to this particular employment policy, we do not think it would be fair to resolve the case by our first instance application of the defense on the present record. In view of the course of proceedings below, the fact that the fetal vulnerability issue is one of first impression, and the need to adapt the business necessity defense to some of its unique and previously unencountered aspects, we think the proper course is to remand for further proceedings confined solely to that issue[23] and on the basis of guidance now to be given. See Satty, 434 U.S. at 150-52, 98 S.Ct. at 355-56 (Powell, J., concurring); Mitchell v. Board of Trustees of Pickens County School District A, 599 F.2d at 587-88; Pennington v. Lexington School District 2, 578 F.2d at 549.
 
 D
 
 55
 It remains to adapt the business necessity defense--in both its substantive and procedural aspects--to the unique circumstances presented by this employment practice. As amici in particular press upon us, the underlying legal and social problem presented is one of complexity and mounting importance in the proper administration of the national policies against employment discrimination as expressed in Title VII.[24]
 
 
 56
 Briefly put, the legal problem is whether and, if so, on what basis, employment practices avowedly designed to protect the unborn fetuses of women workers from workplace dangers can be justified on that basis despite their disproportionate adverse impact upon women's employment opportunities. The social implications of this problem and of any answers given to it are obviously important ones of national policy that might well be, but have not been, addressed narrowly and specifically by Congress. In the absence of such a specific congressional expression, the judicial task is not to devise that policy but to divine probable congressional intention. This may only be done by looking to the broader statutory framework and to authoritative judicial interpretations of that framework.
 
 
 57
 A threshold question is whether under any circumstances the protection of workers' unborn children can properly be considered such a "necessity." The answer is not implicit in the term. Neither, it must be confessed, is it plainly given in the decisional law elaborating the concept of "business necessity" since its original recognition and application in Griggs.
 
 
 58
 That original application, in a challenge to the use of intelligence tests and diploma requirements, was to the most obviously job-related "necessity" of being able effectively to perform the job in question. Since Griggs, the necessity contemplated has been held to run as well to considerations of workplace safety. In our own frequently cited and applied formulation in Robinson v. Lorillard Corp., 444 F.2d 791 (4th Cir.), cert. dismissed, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 665 (1971), Judge Sobeloff put it that the "test is whether there exists an overriding legitimate business purpose such that the practice is necessary to the safe and efficient operation of the business." 444 F.2d at 798 (emphasis added). And the Supreme Court has since also put it that the necessity runs to "safe and efficient job performance." Dothard v. Rawlinson, 433 U.S. 321, 332 n. 14, 97 S.Ct. 2720, 2728 n. 14, 53 L.Ed.2d 786 (1977) (emphasis added).
 
 
 59
 But the question of whose safety may properly be considered a matter of "business necessity" remains an open one. The logical possibilities include women workers themselves, customers--particularly personal service customers--of the business, and others--including fellow workers--legitimately exposed under the circumstances of the particular business to any of its workplace hazards. We are of course concerned here only with the last of these. But the developed judicial view respecting the other two categories is an obvious starting point, since they have been the subject of specific applications whereas the last has not.
 
 
 60
 Though the safety of women workers themselves might be thought the most obvious subject of necessary--hence legally justifiable--restrictions on their employment opportunities, the opposite of course has been held. Among the most obvious targets of the sex-discrimination prohibitions of Title VII were those stereotypical assumptions about women workers' special societal role and physical and emotional vulnerabilities which had generated both "protective" laws and private practices restricting their employment opportunities. Rooting out those restrictions has required that they not now be routinely justified under any of the business-related defenses. Accordingly, the general view when these defenses have been raised by employers has been that they must be rejected because "it is the purpose of Title VII to allow the individual woman to make [the] choice for herself." Dothard v. Rawlinson, 433 U.S. at 335, 97 S.Ct. at 2729 (b.f.o.q. defense); see Burwell v. Eastern Air Lines, Inc., 633 F.2d 361, 371 (4th Cir.1980) (en banc) (business necessity defense), cert. denied, 450 U.S. 965, 101 S.Ct. 1480, 67 L.Ed.2d 613 (1981).
 
 
 61
 The same overriding consideration does not, of course, apply to the safety of others than the women workers themselves. And when that other is a customer required by the very nature of the business to be exposed to certain hazards related to its operation by employees, then the "safety and efficiency" of the operation is in effect an indivisible concern rather than two distinct ones. In such cases, the safety of the customer has been recognized to be of such overriding business necessity that the legal defense should in appropriate circumstances be available. See, e.g., Burwell (airline passenger safety justifies, as business necessity, policy of mandatory leave for pregnant stewardesses); cf. New York City Transit Authority v. Beazer, 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979) (transit authority passenger safety justifies, as sufficiently "job-related," policy excluding methadone users from hire).
 
 
 62
 For purposes of our analysis, the legitimacy of an employer's purpose to protect by discriminatory means the safety of the unborn children of workers would appear to lie conceptually somewhere between a purpose to protect the safety of workers themselves and a purpose to protect that of customers exposed in the normal course to workplace hazards. In attempting to find the more appropriate analogy as between these two objects of safety concerns, it may be helpful to think of unborn children of workers as a special category--though one with quite unique characteristics--of all invitees and licensees legitimately on business premises and exposed to any of its associated hazards. Certainly the safety of unborn children of workers would seem no less a matter of legitimate business concern than the safety of the traditional business licensee or invitee upon an employer's premises.
 
 
 63
 Of such licensees and invitees, it cannot be said--as it can of the workers themselves--that in matters touching their exposure to workplace hazards they, rather than the employer, should have the absolute right of choice as against the right of the employer to guard against it by measures impinging on protected worker interests.[25] On the other hand, it cannot be said of such licensees and invitees--as it can of business customers being served in the workplace--that their safety is so much an aspect of the efficient operation of the business that its protection constitutes a manifest necessity of the business.
 
 
 64
 Viewing the problem in this focused way in attempting to divine probable legislative intent, we believe the safety of unborn children is more appropriately analogized to the safety of personal service customers of the business. The business necessity to provide for customer safety is obviously one of more "overriding" importance, see Lorillard, 444 F.2d at 798, than is the necessity to provide for business "visitor" safety. But we cannot believe that Congress meant by Title VII absolutely to deprive employers of the right to provide any protection for licensees and invitees legitimately and necessarily upon their premises by any policy having a disparate impact upon certain workers. See Beazer, 440 U.S. at 587 & n. 31, 99 S.Ct. at 1366 & n. 31. Especially do we think it unlikely that Congress could have intended such a consequence--given the business imperatives of good labor relations--when the "visitors" protected are members, or potential members, of workers' families.
 
 
 65
 On this basis we hold that under appropriate circumstances an employer may, as a matter of business necessity, impose otherwise impermissible restrictions on employment opportunity that are reasonably required to protect the health of unborn children of women workers against hazards of the workplace.[26]
 
 
 66
 Having determined that the business necessity defense may under appropriate circumstances be an available one in the instant case, we turn now to the problem of how--substantively and procedurally--the defense, as adapted to the program here in issue, may be established in proof. The following principles, drawn from developed business necessity doctrine, we hold to be controlling.
 
 
 67
 1. The burden of persuasion is upon the employer to prove that significant risks of harm to the unborn children of women workers from their exposure during pregnancy to toxic hazards in the workplace make necessary, for the safety of the unborn children, that fertile women workers, though not men workers,[27] be appropriately restricted from exposure to those hazards and that its program of restriction is effective for the purpose. See Lorillard, 444 F.2d at 798 (necessity and effectiveness criteria stated).
 
 
 68
 2. This burden may not be carried by proof alone that the employer subjectively and in good faith believed its program to be necessary and effective for the purpose. Irrespective of the employer's subjective belief and motivation, the significance of the risk, the extent of its confinement to the unborn children of women as opposed to men workers, the consequent necessity of protective measures confined to women workers, and the effectiveness of the actual program for the intended purposes must be established by independent, objective evidence. See Dothard v. Rawlinson, 433 U.S. at 333, 97 S.Ct. at 2728 (objective basis rather than subjective assumptions required to establish b.f.o.q. defense); Burwell, 633 F.2d at 367 n. 6 (objective proof required to establish business necessity).
 
 
 69
 3. While proof of these essential elements of the defense need not be solely by means of expert opinion evidence, the essentially scientific nature of the dispositive issues requires that findings and conclusions establishing the defense be supported by the opinion evidence of qualified experts in the relevant scientific fields.[28]
 
 
 70
 4. To establish the requisite degree and cast of the risk of harm, it is not necessary to prove the existence of a general consensus on the points within the qualified scientific community. It suffices to show that within that community there is so considerable a body of opinion that significant risk exists, and that it is substantially confined to women workers, that an informed employer could not responsibly fail to act on the assumption that this opinion might be the accurate one. See Burwell, 633 F.2d at 373 (employer's discriminatory protective policy properly judged by contemporaneously available information, not on basis of hypotheses requiring unreasonable experimentation nor on ultimate validation of assumptions).
 
 
 71
 5. Proof of the requisite degree and cast of the risk of harm and of effectiveness of the challenged program to avoid it establishes the business necessity defense prima facie.
 
 
 72
 6. This prima facie defense may, however, be rebutted, see Albemarle Paper Co. v. Moody, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1974), by proof that there are "acceptable alternative policies or practices which would better accomplish the business purpose ... [of protecting against the risk of harm], or accomplish it equally well with a lesser differential ... impact [between women and men workers]." Lorillard, 444 F.2d at 798; see Dothard, 433 U.S. at 329, 97 S.Ct. at 2726; Albemarle Paper, 422 U.S. at 425, 95 S.Ct. at 2375.[29]
 
 
 73
 7. Such rebutting evidence to the prima facie defense, if accepted, may have either of two effects, both resulting in employer liability, but with possibly different remedial consequences. See Burwell, 633 F.2d at 372 n. 18 (dual relevance of rebutting proof intimated).
 
 
 74
 By showing an "acceptable alternative" that would accomplish the protective purpose "equally well with lesser differential impact," the evidence would at least negate prima facie proof of the business necessity of the specific program by having demonstrated an "unnecessary" degree of overkill in it.
 
 
 75
 While this would require a finding of liability, any resulting remedial decree should only vindicate, in both prospective and monetary relief aspects, the claimant's rights as they would exist under the "acceptable alternative" policy.[30]
 
 
 76
 But it is possible that the "rebuttal" evidence might suffice, either alone or in conjunction with other evidence, to carry the claimants' retained burden of persuasion that behind the proven but prima facie justified disparate impact of the program there lay in fact a discriminatory intent; that the program in effect involved "disparate treatment." This would result from proof that in view of the demonstrated degree of overkill in the challenged program, the purpose advanced for it had now been revealed to be all along a mere "pretext." See Beazer, 440 U.S. at 587, 99 S.Ct. at 1366; Albemarle Paper, 422 U.S. at 425, 95 S.Ct. at 2375.
 
 
 77
 Upon such a determination, with liability now established for a disparate treatment violation, any resulting remedial decree should of course vindicate claimants' rights wholly freed of any restrictive policy.[31]
 
 IV
 
 78
 The judgment is affirmed in all respects save that portion denying relief to claimants on their "fetal vulnerability" claim. As to that portion, the judgment is vacated and the case is remanded for further proceedings consistent with this opinion.
 
 
 79
 AFFIRMED IN PART; VACATED AND REMANDED IN PART FOR FURTHER PROCEEDINGS.
 
 
 
 [1]
 In each action, the plaintiffs joined the United Paperworkers International Union, AFL-CIO, and Local 1971 as defendants under Fed.R.Civ.P. 19(a). Union counsel advised this court by letter that, because the district court had noted that neither the plaintiffs nor Olin sought judgment against the union, it did not intend to file a brief in this appeal
 
 
 [2]
 By this we do not of course hold that properly drafted stipulations may not suffice for this purpose. They obviously may. See, e.g., Railway Co. v. Ramsey, 89 U.S. (22 Wall.) 322, 327, 22 L.Ed. 823 (1874); Verzosa v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 589 F.2d 974, 977 (9th Cir.1978). Nor do we imply that to be effective such stipulations must identify with the precision of common law pleading all the jurisdictional facts intended to be covered. We hold only that this stipulation, which never speaks in any way to the necessary factual predicates of reasonable cause determination and conciliation efforts related to the charges made in a complaint, does not suffice
 The ambiguity is further revealed in the district court's treatment of the jurisdictional challenge. Relying solely on stipulation # 4, it found that the Commission complied "with all conditions precedent to bringing this action." It recognized the dispute between the parties, however, and found that the scope of its jurisdiction "would extend to the original charge or charges or any alleged discrimination developed in the course of a reasonable investigation of such charge or charges, provided such discrimination was included in the reasonable cause determination of the Commission and was followed by compliance with the conciliation procedures fixed in the Act" (emphasis added). Without further discussion, it then made findings and conclusions on every substantive issue alleged in the complaints, and concluded as a matter of law that it had jurisdiction over the parties and the subject matter of this action. It did not specifically find, however, that the EEOC had made reasonable cause determinations covering all issues.
 
 
 [3]
 Indicative of the ambiguity of this and related stipulations are the parties' conflicting interpretations on this appeal. Olin argues that stipulation # 4 refers only to an allegation based on a charge filed by a single employee, Robert Hutchinson, alleging race discrimination in discharges, and that jurisdiction is therefore limited to this type of claim. In support of this argument, Olin points to stipulation # 2, which states that "[t]he Commission's action ... is based on a charge filed by a Mr. Robert L. Hutchinson on December 1, 1970, which alleged that his discharge was racially motivated." The EEOC asserts to the contrary that stipulation # 4 refers to its entire complaint and thus that jurisdiction exists for all types of discrimination alleged in the complaint. It points to stipulation # 3, which summarizes some 50 charges filed against Olin, of which the Hutchinson charge is the first. We simply find the opposing contentions respecting the effect of this stipulation inconclusive, and the stipulation therefore of no effect in relation to the existence of jurisdiction
 
 
 [4]
 These determinations were based on charges filed by Robert L. Hutchinson, William Adams, Dennis Hemphill, Harold Chatman, and Coretta Crite. Of these, Olin has conceded that the Hutchinson charge of discriminatory discharge was jurisdictionally supported
 
 
 [5]
 The EEOC made a determination of no reasonable cause in William Adams' charge of race discrimination in training, although it found reasonable cause in other areas. This calls into question the jurisdictional notice requirements for the issue of race discrimination in denial of training and entry into craft positions, issue a) above. However, in Olin's plant, specialized training is required to enter Olin's maintenance-craft jobs. We think that a reasonable cause determination and conciliation on the issues of race discrimination in job classifications, seniority and promotion gave Olin sufficient notice that its nearly all-white maintenance-craft work force (resulting from nearly total exclusion of blacks from maintenance-craft training) could be the subject of action
 
 
 [6]
 Coretta Crite charged Olin with race discrimination in hiring after it had refused to hire her after she had resigned due to pregnancy, even though it had rehired similarly situated white females and had rehired black males. The EEOC found no reasonable cause for a charge of race discrimination in hiring, but did find reasonable cause for a charge of sex and race discrimination in rehiring. A reasonable cause determination and conciliation of this issue is insufficient notice to allow the EEOC to bring suit on an allegation of sex discrimination in hiring new applicants, or on any other pure sex discrimination claim
 
 
 [7]
 In March 1979, Wright signed an amended charge reasserting the Step-2 operator issue but adding a general charge of sex discrimination in "hiring, job assignments and classifications, promotions, and other terms and conditions of employment." The district court found that Wright never filed this amended charge with the Commission
 
 
 [8]
 Olin contends that EEOC attorneys improperly assisted the Wright-Howell action by encouraging them to sue, recommending a private attorney, and even typing the judicial complaint and summons. We doubt whether the remedy for improper conduct, if shown to have occurred, is dismissal of the private action. In any event, the record here does not show improper assistance by the EEOC staff. Commission regulations expressly direct employees to "render assistance" in filing a charge. 29 C.F.R. Sec. 1601.6 (1979); see 42 U.S.C. Sec. 2000e-4(g)(3). Cf. EEOC v. Associated Dry Goods Corp., 449 U.S. 590, 101 S.Ct. 817, 66 L.Ed.2d 762 (1981) (EEOC may show its file to charging party)
 
 
 [9]
 The plaintiffs assert that the district court improperly limited discovery on this issue to the records of employees working after 1971. The record reveals substantial evidence on pre-1971 practices regarding seniority, including depositions, admissions and stipulations of fact as far back as 1942. The plaintiffs were provided the complete personnel files of all employees active since 1971 back to their initial date of hire. We find no abuse of discretion in the district court's discovery orders
 
 
 [10]
 The EEOC's expert witness, examining seniority bidding lists, pointed out one instance in which a black woman's name was removed from a list and a male with less seniority was given the job shortly afterwards. However, neither this woman nor anyone else testified that she was coerced into removing her name or that Olin ever failed to select the senior person on a bidding list for a job opening
 
 
 [11]
 We find no abuse of discretion in the district court's order limiting discovery to hourly production employees. The plaintiffs did receive a complete listing of Olin employees, by race and sex, who moved from hourly paid production jobs to salaried positions from January 1, 1971, through September 1978, the dates of each person's move, the initial salaried positions they occupied, and their dates of termination. This listing along with the EEOC's power to investigate and interview hourly employees were sufficient vehicles for uncovering evidence on the promotion issues
 
 
 [12]
 As Olin originally announced its program, all pregnant employees were to be prohibited from working at controlled jobs. Some two weeks later, Olin revised its policy to allow for a case-by-case review
 
 
 [13]
 One restricted job was subsequently downgraded to controlled; one job has not been operating
 
 
 [14]
 Dr. O'Connell did not participate personally in the study
 
 
 [15]
 The findings of fact in full were as follows:
 The Court finds that the policy was instituted for sound medical and humane reasons and is based upon sound medical knowledge and research and years of monitoring of levels of chemical exposure at Olin's plant. The Court further finds that it was not instituted or maintained with the intent or purpose to discriminate against females because of their sex. The evidence shows that the purpose of the policy is to protect the unborn fetus at a time when it is most vulnerable to exposure to harmful chemicals. The policy has been conducted in a reasonable manner, and the Company has counselled with females who have indicated their desire to enter restricted or controlled areas. The record shows that very few female employees have indicated a desire to work in the "restricted" areas. No female employee has filed a charge of discrimination with the Commission alleging that this policy discriminates against females because of sex.
 
 
 [16]
 On this appeal the amici associated in interest with the opposing parties have chiefly argued the fetal vulnerability issue--in both its substantive and procedural aspects, including the appropriate analytical framework. In our ensuing discussion, for sake of simplicity, we ascribe the contentions of amici to the parties with whose respective interests they are associated
 
 
 [17]
 Actually, the claimants suggest that disparate impact/business necessity theory might apply until enactment of the "pregnancy amendment" to Title VII, 42 U.S.C. Sec. 2000e(k), effective October 31, 1978, and overt act/b.f.o.q. theory thereafter, on the basis that as of the enactment date the program became "overtly" one of sex discrimination. Without regard to whether that would make any difference on the facts of this case, we reject it as conceptually unsound for reasons that will appear
 
 
 [18]
 See, e.g., Furnco Construction Corp. v. Waters, 438 U.S. 567, 575-77, 98 S.Ct. 2943, 2948-49, 57 L.Ed.2d 957 (1978); International Brotherhood of Teamsters v. United States, 431 U.S. 324, 358-60, 97 S.Ct. 1843, 1866-67, 52 L.Ed.2d 396 (1977)
 
 
 [19]
 See, e.g., New York City Transit Authority v. Beazer, 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979) ("pretext" proof proper as rebuttal in disparate impact case); Albemarle Paper Co. v. Moody, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (same)
 
 
 [20]
 That proof scheme was essentially developed for the recurring factual situation in which the claim is simply that an employer has, though covertly, treated the claimant "less favorably than others because of ... race, religion, sex or national origin," International Brotherhood of Teamsters v. United States, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977), and the employer's only proffered defense is simply one of denial and rebuttal: "race or sex had nothing to do with it, there was another legitimate reason." See Burdine, 450 U.S. at 254-55, 257-58, 101 S.Ct. at 1094, 1995-96. The special feature of this proof scheme in its threshold presumption to aid proof of the claimed intent to "treat less favorably" that is provided precisely because that intent is denied, is not manifest, and can only be proved circumstantially. See Furnco Construction Corp. v. Waters, 438 U.S. 567, 576-77, 98 S.Ct. 2943, 2949-50, 57 L.Ed.2d 957 (rationale of proof scheme)
 Neither the factual claim nor the factual defense centered here upon the fetal vulnerability program logically invokes that special theory of claim and defense. Here the claim is that the intention to "treat less favorably" is manifest in the very nature of the program and the factual defense is not truly aimed at rebutting this indisputable fact but at justifying it on the basis that the purpose behind it was benign in relation to the claimants' sex. To force such a claim and defense into that special proof scheme would torture its logical foundations. More importantly, treating this as the exclusive theory upon which liability might be based would subvert the settled alternative principle that employer policies or practices that manifestly disfavor women employees in relation to comparably situated males constitute violations of Title VII irrespective of specific intent or motive, unless those policies or practices are affirmatively justified under one of the developed business-related defenses. See Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). That is to say, it would deny claimants' right to have their claim assessed, at least alternatively, under disparate impact theory.
 
 
 [21]
 The inappropriateness of applying the overt discrimination/b.f.o.q. theory of claim and defense--or, more accurately, of treating it as the exclusively applicable, hence dispositive, theory--is that, properly applied, it would prevent the employer from asserting a justification defense which under developed Title VII doctrine it is entitled to present
 Properly applied, this statutory defense is a narrow one, see Dothard v. Rawlinson, 433 U.S. 321, 334, 97 S.Ct. 2720, 2729, 53 L.Ed.2d 786 (1977), under which a concededly discriminatory occupational qualification is shown to be justified because related to the very ability of the disqualified person to perform the job, or, as this court has put it, to be "necessary to the essence of [the] business." Arritt v. Grisell, 567 F.2d 1267, 1271 (4th Cir.1977). As such, it was obviously designed as a necessary, narrow exception to the otherwise flat prohibition against the most obvious form of employment discrimination--an overt qualification such as "males only." But nothing in the statutory exception itself or in Title VII in general suggested that this defense defined the full reach of business justification defenses under Title VII--whether to overt or other forms of discrimination--and the Griggs Court's recognition of the obviously wider business necessity defense soon confirmed that this was not the case.
 An employer may of course in particular litigation still invoke only the narrow b.f.o.q. defense. Almost invariably this is the litigation pattern when the claim is of overt discrimination by means of occupational qualification. But this merely reflects specific litigation choices and the invariability of this factual pattern in the world of employment relations, rather than any general constraints of substantive doctrine. While the loose equation--overt discrimination/only b.f.o.q. defense--is therefore properly descriptive of a paradigmatic litigation pattern, it is not an accurate statement of any inherent constraints in Title VII doctrine.
 In this case, where the defendant-employer has not attempted to present a classic b.f.o.q. defense, it may not properly be forced to do so. We therefore reject claimant's suggestion that because the claim of violation here is arguably one of "overt" discrimination, the employer is confined to a b.f.o.q. defense that obviously cannot be established and indeed is not advanced. Instead defendant is entitled to have considered--though not necessarily to have accepted--the defense actually advanced under the wider scope of the business necessity theory.
 
 
 [22]
 The district court did not in terms identify the theory under which it assessed the evidence. Its critical fact findings seem most relevant to an assessment under disparate treatment theory in which the employer's articulated reason was accepted as dispelling any inference that the program was adopted with the intent to discriminate against women because of their sex. As indicated, Olin basically defends the findings and conclusions on that basis
 
 
 [23]
 We note sua sponte a minor procedural awkwardness in allowing Olin at this stage to defend on this basis. The defense, an affirmative one, was not pleaded. See Fed.R.Civ.P. 8(c). For reasons noted in text, we think it would be unfair to find procedural waiver under the circumstances
 
 
 [24]
 Though, as indicated, the question is apparently one of first impression at the court of appeals level, we are advised that the practice is spreading and that it has been presented in a number of cases, some pending, some settled by consent decrees, in the district courts. The legal, social and economic implications of the problems have drawn a considerable body of scholarly comment. See, e.g., Williams, Firing the Woman to Protect the Fetus: The Reconciliation of Fetal Protection with Employment Opportunity Goals Under Title VII, 69 Geo.L.J. 641 (1981) (legal/social); Finneran, Title VII and Restrictions on Employment of Fertile Women, 31 Lab.L.J. 223 (1980) (appropriate legal theory); McGarity & Schroeder, Risk-Oriented Employment Screening, 59 Tex.L.Rev. 999 (1981) (legal/economic)
 
 
 [25]
 By this we necessarily reject any contention that under Title VII a woman's right to make her own choices respecting workplace hazards rather than submit to discriminatory restrictions is exactly paralleled by a right to make the same choices in behalf of her unborn children. How close the parallel may be in this particular case is a question subsumed in the larger issue of business necessity that we hold is dispositive and still to be resolved here. See Williams, supra note 24, at 651-53
 By our analysis of unborn children's safety in terms that likens them as objects of safety concerns to a category of legal persons--legitimate business visitors--we imply nothing on matters touching their "personhood" in this or any other legal and constitutional context. Whether for any legal purposes they are properly considered persons is irrelevant to, and untouched by, the question whether the avoidance of workplace hazards to safeguard their viability and health in utero or after birth may justify discriminatory employment restrictions by an employer under Title VII. See id. at 652 & nn. 70-72.
 
 
 [26]
 We do not think that a general basis for the "business necessity" asserted here need be sought in other considerations than the general societal interest--reflected in many national laws imposing legal obligations upon business enterprises--in having those enterprises operated in ways protective of the health of workers and their families, consumers, and environmental neighbors. E.g., 15 U.S.C. Secs. 2051-2083 (Consumer Product Safety Act); 21 U.S.C. Secs. 301-392 (Federal Food, Drug and Cosmetic Act); 29 U.S.C. Secs. 651-678 (Occupational Safety and Health Act)
 For this reason it is irrelevant that, as claimants point out, the mere purpose to avoid potential liability and consequent economic loss may not suffice, standing alone, to establish a business necessity defense. See Los Angeles Dept. of Water & Power v. Manhart, 435 U.S. 702, 716-17, 98 S.Ct. 1370, 1379-80, 55 L.Ed.2d 657 (1978).
 That providing workplace safety is in general a matter of "business necessity" does not, of course, establish that in particular cases a specific safety-related "necessity" is sufficiently "compelling" to "override" conflicting private interests protected by Title VII. See Lorillard, 444 F.2d at 798. That is precisely the issue here.
 
 
 [27]
 Showing that the risk sought to be avoided is, on the best available scientific data, substantially confined to the exposure of women workers is critical to showing the program's effectiveness. It is not effective for the stated purpose of protecting offspring of exposed workers from toxic hazards if it is underinclusive for the purpose. Of course, if it were equally inclusive of men and women, it could not violate Title VII, even if it were wholly ineffective in protecting against the actual risks from exposure of either or both sexes
 
 
 [28]
 The evidence given by the three witnesses for Olin on trial would obviously not suffice objectively to validate the necessity and effectiveness of the program. Their testimony went only to establish their own good faith belief, based upon manifestly inadequate data which, in any event, they were not appropriately qualified as experts to evaluate
 On this appeal, opposing amici have invited our attention to a considerable body of scientific data and studies bearing upon all the points here identified as critical to the issues of necessity and effectiveness. Expressing no opinion upon its admissibility in detail if properly offered on trial, we merely note that that is where it must be considered in the first instance.
 
 
 [29]
 This court's formulation of the "business necessity" defense in Lorillard clearly contemplated that proof of "no acceptable alternatives" should be part of the defendant employer's burden in establishing the defense. See 444 F.2d at 798. While the Supreme Court has never expressly repudiated this aspect of Lorillard, its subsequent decisions in Beazer, Dothard and Albemarle Paper have so clearly indicated that proof of "acceptable alternatives" is claimant's burden in "rebuttal," that we must consider Lorillard's formulation to that extent no longer authoritative
 Proof burden aside, we of course express no opinion as to whether any "acceptable alternatives" may here be shown. The most obvious possibilities--as suggested on appeal by amici associated in interest with claimants--would involve reduction of workplace hazards to the point that no, or less stringent, restrictions were necessary to give adequate protection; imposing equal restrictions on men and woman workers; imposing less stringent restrictions on women without reduction of hazards; or various combinations of these. Whether any alternatives such as these or others are "acceptable," in terms of their effectiveness and their economic and technological feasibility, is a factual/legal issue to be addressed by the district court in the first instance on the basis of any evidence adduced upon it in further proceedings.
 
 
 [30]
 By this we reject the possible implication from the Supreme Court's decisions in Albemarle Paper and Beazer that the only possible effect of such rebutting evidence is to show discriminatory intent by proof of "pretext." We are aware that the question is an arguable one upon which there is a difference of scholarly and judicial opinion. As to the former, compare, e.g., Furnish, A Path Through the Maze: Disparate Impact and Disparate Treatment Under Title VII of the Civil Rights Act of 1964 After Beazer and Burdine, 23 B.C.L.Rev. 419, 423-25 (1982) (may have dual relevance, to prove pretext or to "undercut" defense), with Note, Rebutting the Griggs Prima Facie Case Under Title VII: Limiting Judicial Review of Less Restrictive Alternatives, 1981 U.Ill.L.Rev. 181, 207-10 (1981) (only relevant to prove pretext). As to the latter, there appears to be little beyond a few decisions making assumptions running both ways. Compare, e.g., Blake v. City of Los Angeles, 595 F.2d 1367, 1383 (9th Cir.1979) (dictum: dual relevance assumed), cert. denied, 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980), with Harless v. Duck, 14 Fair Empl.Prac.Cas. 1616, 1625 (N.D.Ohio 1977) (only relevant to prove pretext)
 Our interpretation of the critical Supreme Court decisions is that they establish two things: (1) that the defendant-employer's burden to prove business necessity in justification of a disparate impact does not include proof of "no acceptable alternatives," the burden instead being upon claimants in rebuttal to prove that acceptable alternatives exist, see supra note 29; and (2) that such rebuttal evidence may prove a disparate treatment violation notwithstanding that claimant's proof initially went only to establish disparate impact, see infra note 31.
 In the absence of a definitive statement to that effect by the Supreme Court, we do not believe that the Court intended also to deny the opportunity of a claimant to establish the right to a remedy designed to create a "lesser differential impact," see Lorillard, 444 F.2d at 798, justified at the lesser but not the extant level by business necessity. We observe in this connection that in Dothard the Court did not advert to pretext as the object of rebuttal proof. 433 U.S. at 329, 97 S.Ct. at 2726.
 We do not understand Furnco Construction Corp. v. Waters, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978), to be to the contrary. That decision held that a court may not impose upon an employer a remedy requiring it to adopt the "best" practices available for the enhancement of minority employment opportunities, because courts are "generally less competent than employers to restructure business practices." Id. at 578, 98 S.Ct. at 2950. But this was on the basis that no Title VII violation had been proven in the particular case, either of disparate impact or disparate treatment. Id.
 Here disparate impact has been proven prima facie, and the question is merely whether under the flexible remedial powers conferred by Title VII, a remedy designed to minimize but not completely remove the burden of a proven disparate impact may be imposed.
 
 
 [31]
 The Supreme Court's recognition in Albemarle Paper and Beazer that following prima facie proof and prima facie avoidance of a disparate impact claim, a claimant can yet prove discriminatory treatment by showing "pretext" in the challenged practice simply reaffirms the Court's consistent admonition that both theories may appropriately be applied as alternative bases of recovery on the same set of facts. See Teamsters, 431 U.S. at 336 n. 15, 97 S.Ct. at 1855 n. 15