Theresa Williams WRIGHT, individually
and on behalf of all others similarly
situated, et al., Plaintiffs,

v.

OLIN CORPORATION, et al.,
Defendants.

No. A–C–79–107.

United States District Court,
W.D. North Carolina,
Asheville Division.

Feb. 2, 1984.

Ervin L. Ball, Jr., Asheville, N.C., American Civil Liberties Union Foundation by Joan E. Bertin, New York City, for plaintiffs.

Woods, Villalon, Hollengreen & Lindeman by Leonard Appel, Washington, D.C., Melinda J. Branscomb, Nashville, Tenn., Charles B. Merryman, Jr., Charlotte, N.C., for defendant Unions.

Brooks, Pierce, McLendon, Humphrey & Leonard by Thornton H. Brooks, M. Daniel McGinn, Greensboro, N.C., McGuire, Wood, Erwin & Crow by Charles R. Worley, Ashe-

ville, N.C., William B. Dickinson, Labor Counsel, Olin Corp., Stamford, Conn., for defendant Olin Corp.

## MEMORANDUM OPINION

WOODROW WILSON JONES, Chief Judge.

In obedience to the mandate of the Court of Appeals, 697 F.2d 1172 (4th Cir.1982), this Court conducted further proceedings on the sole issue of the validity of the Defendant's fetal vulnerability policy under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. Section 2000e, et seq. This issue was first raised by the Equal Employment Opportunity Commission (EEOC) in its across-the-board complaint against the Defendant, Olin Corporation (Olin), No. A–C–78–186, which action was consolidated for trial with this class action brought by the Plaintiff, Theresa Williams Wright (Wright), a female employee of Olin. The Court of Appeals held that this Court did not have jurisdiction over the fetal vulnerability policy in the EEOC action because of a lack of a reasonable cause determination, 697 F.2d at 1176,[1] but determined and held that Wright as the class representative of all female hourly employees could properly raise this claim. *Id.,* at 1179.

Olin's fetal vulnerability policy is a company wide program adopted in February 1978 after some four years of planning and a review of the medical literature by the Corporate Department of Hygiene & Toxicology wherein it concluded that the program was necessary to protect the unborn fetuses of pregnant women employees from the damaging toxic effects of certain chemicals used in the manufacturing process at its various facilities to which the women were exposed. The program was instituted at the Pisgah Forest, North Carolina facility in 1978 and contains three job classifications. These classifications are as follows:

1. *"Restricted jobs"* which may require contact with and exposure to known or suspected abortifacient or teratogenic agents. Fertile female employees are excluded from such jobs. Women through age 63 are assumed to be fertile and can be placed in a restricted job only after consulting with Olin's medical doctors to confirm that they cannot bear children and will sustain no other adverse physiological effects from the environment. At present there are approximately twelve jobs placed in the restricted category.

2. *"Controlled jobs"* are those which may require very limited contact with harmful chemicals, and non-pregnant women are permitted to work at such jobs after receiving counselling by the plant medical director and with the understanding that they will notify their supervisor when they become pregnant. Olin encourages women in controlled jobs to bid for other jobs if they intend to become pregnant and pregnant employees who are moved from controlled jobs have their seniority protected during their absence. There are a significant number of jobs classified as controlled jobs.

3. *"Unrestricted jobs"* are those in areas where exposure to hazardous substances and agents do not present a hazard to the pregnant female or the unborn fetus, and such jobs are open to all women.

The policy provides for the downgrading of restricted jobs to controlled or unrestricted whenever the level of exposure is reduced in the different areas. The evidence shows that Olin is making a reasonable, good-faith effort to reduce the chemical exposure level through the use of a sophisticated system for monitoring the levels. Very few female employees have indicated a desire to work in a restricted area, and no employee has filed a charge of discrimination with the EEOC charging that the policy discriminates against females because of sex. Schedule A attached hereto lists the restricted job classifications, the chemicals involved and the applicable exposure levels at the Pisgah Forest facility.

---

1. The acting regional attorney of the EEOC advised this Court by letter of September 2, 1983, that it was no longer involved in the litigation of the fetal vulnerability issue.

The Court of Appeals concluded that the disparate treatment approach which this Court followed when it rendered its decision in 1980, 24 FEP Cases 1646, 26 EPD § 32, 104, was inappropriate and that the disparate impact/business necessity approach should be followed instead. 697 F.2d at 1185. It was held that the evidence of the existence and operation of Olin's fetal vulnerability program or policy as disclosed by the record established as a matter of law a *prima facie* violation of Title VII (Id., at 1187), but the Court concluded that "under appropriate circumstances an employer may, as a matter of business necessity, impose otherwise impermissible restrictions on employment opportunity that are reasonably required to protect the health of unborn children of women workers against hazards of the workplace." Id. at 1189–90. The Court then set forth certain controlling legal principles for establishing and refuting the business necessity defense in this case.

This Court conducted the remand proceedings in Asheville, North Carolina on September 29 and 30, 1983 and Olin presented its evidence of non-discriminatory reasons to rebut the *prima facie* showing that Wright and the claimants were held to have established at the first trial. After considering the evidence, briefs and arguments the Court now enters its findings and conclusions in this Memorandum Opinion.

The evidence shows and the Court finds that the predominant hazardous substances present in the various restricted job classifications at Olin's Pisgah Forest facility are toluene (with benzene being a contaminant of toluene), carbon disulfide and lead. Fletcher H. Roberts, Jr., Olin's Group Director, Safety Loss Prevention and Services, an expert in the field of industrial safety and health, testified as to the use of these various chemicals in the plant and the exposure levels in the restricted areas. He testified that Olin has considered the following possible alternatives which have a less discriminatory effect than the policy in question.

1. The possible use of respirators and other personal protective equipment, but that these practices, at best, are only a temporary resolution and are not feasible in daily operations.

2. Olin has provided better ventilation in various work areas at the Pisgah Forest plant but further improvements are not possible in the existing facility.

3. Olin has substituted chemicals through the purchase of a better grade of toluene at greater cost which contains less benzene, but there is no further chemical substitution that can be made at the present time which would enable the company to continue the manufacture of cellophane. If Olin were to discontinue the manufacture of cellophane at the Pisgah Forest plant, approximately 450 employees would be directly affected and an additional number would be indirectly affected as they provide staff support for both the cellophane and paper operations.

4. Olin maximizes the goals of worker health and equal employment through the transfer, rather than the exclusion, of its workers to other positions. This alternative is encouraged. No female employee has filed a charge that she has been denied the right to transfer to a non-risk position.

Mr. Roberts further testified that since the adoption of the exclusionary policy in 1978, Olin has monitored scientific research and technological developments regarding the hazards in its plants and has a separate corporate department to study such matters. He also testified that Olin has met all of the Occupational Safety and Health Act standards for the exposure levels pertaining to its employees at the Pisgah Forest plant.

Olin presented Dr. Sergio E. Fabro, Program Director, Columbia Hospital for Women, Department of Obstetrics and Gynecology, The Georgetown University School of Medicine, Washington, D.C. as an expert witness and the Court found that he was an expert in the field of obstetrics-gynecology, with emphasis in high risk obstetrics and reproductive toxicology. He testified that there is no barrier in a female

which would prevent the transportation of potentially harmful chemicals and hazardous substances that are involved in this action from the maternal circulation into the unborn fetus. That the embryo/fetus is at the greatest risk from exposure to chemicals during the first two weeks of pregnancy, a time period during which the mother is likely to be unaware of her pregnancy and during which the most dramatic and critical aspect of the development of the embryo/fetus occurs. The amount of toxic substance necessary to damage the fetus is much smaller than the amount which can injure an adult. He stated that the consequences of exposure of the embryo/fetus to chemical hazards such as are involved in this action may include death of the fetus, structural defects and functional deficiencies which may be apparent at birth or later, and growth retardation.

During his testimony, Dr. Fabro referred to numerous treaties, periodicals and pamphlets which are established and recognized authoritative treaties or articles and stated he had reviewed them in the preparation for his testimony and his written report on this subject. Some of these articles and treaties were admitted into evidence at the trial. He also stated that he had examined the written report of Drs. Malcolm C. Johnston and Woodhall Stopford who testified in the case and agreed with the opinions expressed and conclusions reached by them insofar as they relate to his field of expertise. Dr. Fabro expressed the opinion that there were significant risks of harm to the unborn children of women workers at Olin's facility from their exposure during pregnancy to the toxic hazards of carbon disulfide, benzene, toluene and lead, and that women of reproductive years should be restricted from an exposure to such toxic hazards in order to avoid potential harm to the offspring. It was his opinion that Olin's policy accomplishes that purpose and is necessary in view of the chemicals used in the plant.

Dr. Malcolm C. Johnston, Professor of the Schools of Dentistry and Medicine at the University of North Carolina at Chapel Hill was found to be an expert in the fields of teratology, embryology and developmental toxicology. Dr. Woodhall Stopford, Director of Postgraduate Training Program in Industrial Medicine and Toxicology, Duke University Medical Center, Durham, North Carolina was found by the Court to be an expert in the fields of industrial toxicology and occupational medicine. Both doctors testified at the trial that they had made scientific studies of the fetotoxic and/or teratogenic potential of benzene, toluene, carbon disulfide, and lead and that there is a significant risk of harm to the unborn children of women workers from the excessive exposure before or during the pregnancy to such toxic chemicals. They made a special examination of Olin's plant at Pisgah Forest and prepared and filed with the Court a paperwriting entitled "Evaluation of Olin Corporation's Fetal Vulnerability Policy as it applies to its Pisgah Forest Facility," consisting of 28 pages of text, 8 pages of tables and 5 pages of references and scientific publications. They concluded that the levels of exposure at Olin's Pisgah Forest facility are such that exposure of women of child bearing potential to hazardous chemicals in work areas covered by Olin's fetal vulnerability policy would put unborn children of such workers at a significant risk of harm. That by restricting women of child bearing potential from work in areas where there is potential exposure to toluene/benzene, carbon disulfide or lead, Olin's policy has effectively decreased the vulnerability of unborn children of workers to adverse effects.

The expert witnesses testified in this action that the assessment of potential damage of environmental factors to the embryo and the fetus include human studies and animal studies. Naturally, there have been more animal studies than human studies on the general subject of fetotoxicity because of the difficulty in obtaining controlled information on humans. To account for the differences between experimental animals and humans who are more sensitive to exposure than animals a ten-fold safety fac-

tor is commonly introduced before utilizing animal data to determine safe levels of exposure for humans. Because of individual differences in humans (such as diet, smoking habits, genetic differences, etc.) an additional ten-fold safety factor is commonly introduced to further account for differences in individual susceptibility. The use of such safety factors in extrapolating from animal studies to humans is commonly accepted in the scientific community and a 100-fold safety factor utilized by Drs. Johnston and Stopford is a relatively conservative safety factor.

The evidence shows that any significant risks of harm to the unborn children of the Plaintiff and the class of employees whom she represents in this action from their exposure prior to and during pregnancy to the chemicals used at the Pisgah Forest facility do not make it necessary, for the safety of unborn children, to restrict male employees from the exposure to those hazards. The testimony of the expert witnesses appearing before the Court indicates that risks sought to be avoided by Olin's policy are, on the best available scientific data, substantially confined to the exposure of its female employees. Dr. Fabro's written report which is in evidence reveals that: "While there is some scientific evidence to support the possibility of adverse exposure of the male to certain chemicals before implantation, such evidence is scant, especially compared to the strong evidence supporting harm to the developing embryo/fetus through exposure of the pregnant females during early stages of pregnancy. The limited scientific data which is available that might suggest harm to the fetus through exposure of the male to chemicals indicates that the exposure levels which might produce such a result are significantly higher than the exposure levels at which the embryo/fetus could be harmed through exposure to the pregnant female." He testified that in his opinion, male workers at Olin's Pisgah Forest facility should not be restricted from exposure to these hazardous substances.

Drs. Johnston and Stopford testified that there is no scientific evidence which establishes that the exposure of a male employee, to toluene/benzene or carbon disulfide can cause harm to the fetus. These qualified experts further testified that there is no available scientific evidence from human studies which establishes that exposure of the male to lead adversely affects the fetus. However, there is some evidence, in animal studies, that exposure of the father to lead might affect the fetus but Dr. Stopford testified that the exposure levels at which harm through the father might be affected are much greater than those at which harm results from exposure of the mother to lead.

Drs. Johnston and Stopford's written report concludes that "for exposures to toluene/benzene, carbon disulfide and lead, the risk to unborn children is significantly greater for maternal exposure as compared to paternal exposure such that a policy that restricts exposure of women of child bearing potential, but not of men, adequately protects the safety of unborn children of such workers."

The Court of Appeals held that Olin need not prove the existence of a general consensus within the qualified scientific community on the points that there are significant risks of harm to the unborn children of female workers from their exposure to toxic hazards in the work place which make it necessary, for the safety of the unborn children, that fertile female employees, though not male employees, be appropriately restricted from exposure to those hazards, and that Olin's policy is effective for that purpose. Specifically the Court held: "It suffices to show that within that community there is so considerable a body of opinion that significant risk exists, and that it is substantially confined to women workers, that an informed employer could not responsibly fail to act on the assumption that this opinion might be the accurate one." 697 F.2d at 1191.

It was the unqualified opinion of Drs. Johnston and Stopford, both eminently qualified scientists in their respective fields, that "there is such a considerable

body of qualified scientific opinion as to fetotoxic and/or teratogenic risks to the fetus, and that such a risk is substantially confined to maternal exposure to benzene/toluene, carbon disulfide or lead, that an informed employer could not reasonably fail to act on the assumption that such an opinion might be the accurate one." Dr. Fabro agreed with these opinions and conclusions.

A number of scientific studies were admitted in evidence and have been considered by the Court and they corroborate the opinions expressed by the independent and objective testimony of the expert witnesses heard by the Court. There is nothing in the record which in any way detracts from the validity of the evidence presented in the remand proceedings.

■ The Court finds that Olin's policy is not underinclusive because it has established by its proof that the fetal health effects which form the basis for its policy in fact occur only through maternal exposure at which employees are exposed. There is a substantial risk of fetal harm through maternal exposure, as contrasted with a negligible or theoretical risk through paternal exposure. Clearly, the hazard is significantly greater for women workers than for males, and the risk is substantially confined to women workers.

■ The Court further finds that Olin has met the standard set forth in the opinion of Judge Phillips writing for the Court of Appeals, 697 F.2d at 1191.

■ The Court of Appeals did not, and the law does not, place upon Olin any burden of establishing that there were acceptable alternative policies or practices which would better accomplish its business purpose of protecting the fetus against the risks of harm from exposure to these hazardous substances, or by accomplishing it equally well with a lesser differential impact between female and male employees. See *New York City Transit Authority v. Beazer*, 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979); *Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977). Nevertheless the evidence tends to show that Olin has established that there are no acceptable alternative policies and practices. As strong as this evidence is the Court is not in a position to say that Olin should or should not adopt other alternatives to reduce the level of exposure of its women employees to the hazardous substances in its plant. As pertinently observed in *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978), "courts are generally less competent than employers to restructure business practices, and unless mandated to do so by Congress they should not attempt it." 98 S.Ct. at 2950.

The policy is not underinclusive because it is not applicable to men workers. The policy is not overinclusive as it excludes sterile women or women of nonchildbearing capacity. Exclusion of women who are fertile but are not pregnant is justified on the basis that women are unlikely to know that they are pregnant during the first eight weeks of fetal development which, as testified by the expert witnesses, is commonly considered the period of greatest vulnerability of the fetus. Any legal requirement that the policy must be made to benefit all female employees would chill the efforts of employers to voluntarily devise and implement a fetal vulnerability policy.

We have seen in this century an unprecedented advance in synthetic chemistry which has resulted in an increasingly complex chemical work environment. Since many of these chemicals have novel structures, not previously existing in nature, their long-term adverse effects in biological systems in general and in the human in particular, are not known. These technological advances pose potential toxic hazards to human life, including adverse effects on reproduction and development. Advances in the understanding of the reproductive toxicity of chemicals has not kept pace with the introduction of new chemicals into the environment. Although the ability to test new chemicals for reproductive toxicity using laboratory animals has been refined, there are still significant

limitations in the confidence with which the scientific community uses such data for extrapolating to the human situation. See the Report on Environmental Hazards to Human Reproduction by Dr. Fabro. PP 32–33, Exhibit D.

The magnitude of this is shown by the fact that the data discloses that approximately one in every five pregnancies terminates in spontaneous abortion and one in twenty conceptuses dies in utero. Of infants born alive, one in ten are premature and some 3 to 7% present some type of growth congenital defect at birth.

■ An employer such as Olin can justifiably choose a policy of fetal protection as a moral obligation to protect the next generation from injury, and it is a social good that should be encouraged and not penalized. Women in general should applaud the effort and there is every indication that most of the women employees at the Olin plant appreciate and support the policy.

The Court finds and concludes that Olin has submitted scientific proof to establish that the hazardous substances used at its plant in Pisgah Forest present substantial risks of fetal harm and has adopted a policy which will decrease or eliminate the possibilities that a defective child will be born to its women workers because of their exposure to such substances in the work place. In establishing its policy, Olin acted on the best scientific evidence available to it and based on that information, is applying its policy of restriction or exclusion to the only group for which there is scientific evidence of harm. The record demonstrates that there is no less discriminatory way of achieving this goal. Olin should not be required to allow women employees at a known risk to stay on the restricted jobs until there is scientific evidence compiled with respect to men.

The Court readopts Findings of Fact Nos. 1–27, 39–40 of this action and Nos. 76–79 in *EEOC v. Olin Corporation, et al.*, Civil Action No. A–C–78–186, both filed on December 29, 1980. See 24 FEP Cases 1646 (1980); 26 EPD § 32, 104 (1980).

The Court concludes from the evidence presented during the remand proceedings that the Defendant Olin has rebutted the *prima facie* case of discrimination established by the Plaintiff at the first trial by showing through the testimony of independent, objective scientific expert witnesses a business necessity for its fetal vulnerability policy. The business necessity defense has not been rebutted by the Plaintiff. The Court therefore concludes that Olin's fetal vulnerability policy does not discriminate against the Plaintiff or the class which she represents in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. Section 2000e–5(f) or 42 U.S.C.A. Section 1981, or in any other respect.

The Court concludes that neither the Plaintiff nor the class members she represents are entitled to any relief sought in the complaint and Olin is entitled to a judgment of dismissal of the action with prejudice.

The mandate of the Court of Appeals remanding this action in part for further proceedings has been complied with by the entry of this Memorandum Opinion which contains this Court's findings of fact and conclusions of law as required by Rule 52(a), Federal Rules of Civil Procedure. A judgment dismissing the action will be entered simultaneously with this Memorandum Opinion.

## SCHEDULE A

### RESTRICTED JOBS – OLIN'S PISGAH FOREST FACILITY

| WORK AREA (Job Classifications Included) | NO. OF EMPLOYEES 1978 | 1980 | 1983 | PREDOMINANT CHEMICAL AGENTS PRESENT | EXPOSURE LEVELS (ppm) 1975-78 | 1979-80 | 1982-3 |
|---|---|---|---|---|---|---|---|
| **Coating Tower** | | | | | | | |
| Coating Bath Operator ) | 4 | 4 | 4 | TOLUENE | 1.2-4.7 (av.) | 7.1-138 | 4.7-18.3 (av.) (500 peak) |
| #1 Coating Operator ) | 17 | 17 | 12 | | | | |
| #2 Coating Operator ) | 12 | 12 | 14 | | | | |
| **Solvent Recovery** | | | | | | | |
| Solvent Recovery Operator ) | 5 | 5 | 4 | TOLUENE | 7.6 (av.) | 4.3-5.5 | 13.9 (av.) |
| **RC Coating (Laminator #2)** | | | | | | | |
| RC Operator #1 & Polymer Bath Operator ) | 8 | – | 8˘ | TOLUENE | 100-400 | 2-19 | 12-69 |
| RC Operator #2 ) | 12 | – | 2* | | | | |
| **Barrette Room** | | | | | | | |
| Chemical Bldg. Operator and/or VRR Operator ) | 41 | 41 | 35 ) | $CS_2$ | 0.7-17.8 | – | 5.0-8.2 (40 peak) |
| Utility Operator ) | 2 | 2 | 0 ) SAME EMPLOYEES | | | | |
| **Viscose Ripening** | | | | | | | |
| Chemical Bldg. Operator and/or VRR Operator ) | | | ) INTER-CHANGE | $CS_2$ | 1.9-3.1 | – | 4.9-5.1 |
| Utility Operator ) | | | | | | | |
| **Casting–Wet End** | | | | | | | |
| Steps 1-5, Casting Line of Progression | 53 | – | 22** | $CS_2$ | 2.1-7.0 | – | 4.2-11.0 |
| **Lead Burning** | | | | | Air (mcg/m³) 56-273 | Blood (mcg%) 31-40 (35 av.) | Air (mcg/m³) 40 (max.) — Blood (mcg%) 15.5 (av.) |
| Lead Burner Specialist | 1 | 1 | 1 | LEAD | | | |
| Lead Burner Helper | 0 | 0 | 0 | | | | |

\* Reclassified from restricted to controlled on 9/12/79.
\*\* Reclassified from restricted to controlled on 5/30/79.