**Dwain C. JONES, individually and on behalf of all others similarly situated, Plaintiffs,**

v.

**GENERAL TIRE AND RUBBER COMPANY, Defendant.**

**Thaddeus McFADDEN, Plaintiff,**

v.

**GENERAL TIRE AND RUBBER COMPANY, Defendant.**

No. C–C–83–927–P, C–C–83–932–P.

United States District Court,
W.D. North Carolina,
Charlotte Division.

April 25, 1985.

Michael A. Sheely, Charlotte, N.C., for Dwain C. Jones.

Wayne C. Alexander, Casey, Bishop, Alexander & Murphy, Charlotte, N.C., for Thaddeus McFadden.

John O. Pollard, Whiteford S. Blakeney, Paul Taylor, Blakeney, Alexander & Machen, Charlotte, N.C., for defendant.

## MEMORANDUM OF DECISION

ROBERT D. POTTER, Chief Judge.

THIS MATTER is a discrimination case based on the disparate impact theory which came on to be heard before the undersigned at Charlotte, North Carolina on February 11, 1985. The Plaintiff, Jones, was represented by Michael A. Sheely, Attorney at Law, and the Plaintiffs McFadden and Bennett were represented by Wayne Alexander, Attorney at Law. The Defendant General Tire Co. (General) was represented by Whitford Blakeney, John O. Pollard, and Paul B. Taylor, Attorneys at Law.

At the hearing both parties agreed that the facts were not in dispute. Briefly, the facts giving rise to this dispute are that in 1982, due to the economic conditions prevailing at that time, the Defendant's plant on Freedom Drive in Charlotte, North Carolina was closed, with the consequent loss of employment by the Plaintiffs. At the time of the closing there were 16 hourly employees working at the plant of whom 15 were black and one was white. These employees were all members of a bargaining unit, International Union of Operating Engineers Local 465. The Plaintiffs in this action were all long time employees of General at the Freedom Drive Facility, Jones having been hired in May 1979, Bennett in 1976, and McFadden in 1963. There was not any evidence that any of the Plaintiffs had not been good employees. In fact, the only evidence was that they had performed their duties at General in a satisfactory manner.

After their termination at the Freedom Drive Plant, all of the Plaintiffs applied at the other General facility in Mecklenburg County, the Arrowood Facility. The bargaining unit for hourly employees at that facility was Local No. 850 United Rubber, Cork, Linoleum & Plastic Workers of America, AFL–CIO. McFadden applied in November 1982, Jones in December 1982 and January, February, March, and April 1983 and Bennett applied in January and February 1983. All applications were made through the North Carolina Employment Security Commission Office, though there was disputed evidence that one or more of the Plaintiffs applied directly to the Arrowood facility office also. Be that as it may, all three Plaintiffs did apply at General and all three employees were refused employment.

The Defendant contended that the reason for refusing employment to the Plaintiffs was a company policy established in 1971 that employees with one bargaining unit could not be employed at another bargaining unit within the Company. The reason for the policy as articulated by the Defendant's Vice President and Director of Industrial Relations was that to allow an employee with several years seniority to be employed at another bargaining unit within the Company would result in loss of his seniority under the union contracts and based on his and the Company's experience it would cause that employee to be disgruntled because he would have less seniority than employees at the bargaining unit to which he transferred, even though the employees at the bargaining unit to which he transferred may have less seniority with the Company, but had been with that particular bargaining unit a greater time than the transferring employee; thus, the employees with the bargaining unit a greater length of time would, for example, have more vacation, job bidding rights ahead of the transferring employees, and would be the last to be laid off. The transferring employee would also lose his Pension Plan

benefits and receive less compensation. The union contracts prohibit the transfer of seniority from one bargaining unit to another.

The Defendant's evidence was that it had closed seven Retread Facilities and the Akron Manufacturing Facility during 1982, affecting 859 white employees and 178 black employees. The Defendant's evidence was that 22 of the white employees from bargaining units at other locations had applied at the Arrowood Facility and had been denied employment for the same reason that the Plaintiffs had been denied employment.

The Plaintiffs contend that the fact that the policy prohibited 15 black employees and only one white employee at the Freedom Drive facility from being hired at the Arrowood facility had a statistically adverse impact on blacks, and therefore, even though the policy was facially neutral it was in fact discriminatory.

## SPECIFIC FINDINGS OF FACTS

(1) Defendant General Tire & Rubber Co. (General) is an employer within the meaning of 42 U.S.C. § 2000–e(b) and is a person within the meaning of 42 U.S.C. § 1981.

(2) The Plaintiffs in their complaints prayed the Court for a declaration that this action could be maintained as a class action. However, the Court finds that there are an insufficient number of persons in the class to meet the requirements of the Federal Rules of Civil Procedures for a class action. Fed.R.Civ.P. 23(a)(1).

(3) In November of 1982 and for sometime prior thereto, the Defendant operated two plants in Charlotte, Mecklenburg County, North Carolina—one a tire retreading facility known as the Charlotte Kraft Retread Plant of the General Tire & Rubber Company, was located on Freedom Drive (the Freedom Drive Plant) and one, a tire manufacturing facility, was on Continental Boulevard in Arrowood Industrial Park in Mecklenburg County, North Carolina (the Arrowood Plant).

(4) The Plaintiffs in these actions were all employees of the Freedom Drive Plant in November 1982 and prior thereto.

(5) In November 1982 the Freedom Drive Plant along with tire retreading plants in Akron, Ohio; Boise, Idaho; Dallas, Texas; Lisle, Illinois; Orlando, Florida; and Elkton, Maryland were closed because of a decline in their business.

(6) The hourly employees at the Freedom Drive Plant, including fifteen blacks, among them the Plaintiffs, and one white, were members of a bargaining unit, the International Union of Operating Engineers, Local 465, AFL–CIO. The hourly employees at the Arrowood Plant were members of Local No. 850, United Rubber, Cork, Linoleum & Plastic Workers of America, AFL–CIO.

(7) Defendant's Exhibit 5, which was admitted into evidence, is a copy of the Agreement between the Union and the Defendant General Tire at the Freedom Drive Plant (Agreement). The Agreement provides in Article I that the term "employee" includes all production and maintenance employees and inspectors, which would include the Plaintiffs.

Article XII, Section 1 reads: *"Seniority is defined as continuous service with the Charlotte Kraft Retread Plant* (emphasis added) of the General Tire & Rubber Co. and is that time actually spent on the active payroll.

"Section 2. In all filling of vacancies and transfers *within the bargaining unit* (emphasis added) the principle of *seniority* shall govern, providing the *senior* employee possesses the necessary qualifications to become proficient on the job …

"Section 3. In the event of lay-offs the last man hired shall be the first laid off and recalls shall be in reverse order."

(7) The Plaintiffs, black members of the bargaining unit, were all laid off in November of 1982, when the Freedom Drive Plant closed, together with the supervisors, other black members, and one white member of the bargaining unit.

(8) Each of the Plaintiffs applied at the Arrowood plant for a job as a laborer or production worker.

(9) Each of the Plaintiffs testified that they would not have insisted on their *seniority* rights with General if they had been hired at Arrowood, and in fact would waive any *seniority* rights.

(10) Each Plaintiff filed a charge of discrimination on the grounds of race within the statutory time and each Plaintiff received a right-to-sue letter from the Equal Employment Opportunity Commission, which found in each Plaintiff's case no reasonable cause to believe the allegations made in the charge are true.

(11) All of the Plaintiffs were what would be termed "good workers" and all were experienced in their jobs.

(12) All of the production workers at the Freedom Drive plant including the Plaintiffs were members of the union bargaining unit. *The supervisors, McQuain, Kennedy, and Troublefield, were not* members of the bargaining unit and McQuain was hired at the Arrowood Plant, Kennedy in the International Division, and Troublefield went to work for another company.

(13) None of the Plaintiffs were hired at the Arrowood Plant, but would have accepted employment if offered.

(14) The hourly employees at the Arrowood Plant were members of a bargaining unit, Local 850 and the International Union of the United Rubber, Cork, Linoleum and Plastic Workers of America.

(15) Defendant's Exhibit 6 is a copy of the Agreement between the Union and the Defendant General Tire at the Arrowood Plant. This Agreement provides in Article I that the Company recognizes the Union as the exclusive collective bargaining representative of all production and maintenance employees at that location.

(16) That Agreement (Defendant's Exhibit 6) refers to seniority numerous times.

(17) The Defendant's stated reason for not hiring the Plaintiffs was that since the Plaintiffs were members of a different union bargaining unit at the Freedom Drive Plant than the union bargaining unit at the Arrowood Plant, to hire them at Arrowood in the jobs they applied for, (production) would have violated a company policy which has been in effect since 1971, prohibiting transfer of employees from one bargaining unit within the Company to another bargaining unit. The Defendant's evidence was that the purpose of the policy was to avoid having "disgruntled" employees who even though they had been with the Company a number of years (as had Plaintiff McFadden who had been with the Company 19 years) may well be junior in seniority rights to an employee who had only a few months seniority with the Company. As can be seen from Defendant's Exhibit 6, this would affect such employee rights as bidding on a job, benefits, vacations and compensation, as well as other rights of employees. The collective bargaining contracts at both the Freedom Drive Plant and the Arrowood Plant define seniority in such a way as to prohibit carrying seniority from one bargaining unit to another. The Defendant did not consider allowing the Plaintiffs or other employees who were members of a bargaining unit to transfer to another bargaining unit with the understanding that the transferring employees would waive their seniority rights when transferring because, if the employee waived his rights, he would be a "disgruntled" employee because employees who had been with the Company a shorter length of time would have superior rights as a result of greater seniority with the bargaining unit to which the Plaintiffs or similarly situated employees transferred.

(18) Seniority rights of the bargaining unit employees was one of the most important employment rights secured by the union contract, as is obvious from Defendant's Exhibit 6.

(19) This policy of no transfer/no hire affected more blacks than whites in the particular bargaining unit to which the Plaintiffs belonged simply because there were 15 blacks in the bargaining unit and only one white.

(20) The Defendant's evidence was that approximately 1,037 employees were laid off when the Defendant closed the eight plants in November 1982. Of these 1,037 employees 859 were white, or 83%, and 178 or 17% were black. *All* those employees were barred from transferring to or being hired at another bargaining unit in a General Tire facility. The uncontested evidence was that 22 of these employees, all white, who were laid off at other bargaining units applied to the Defendant Arrowood Plant, but were refused employment because of the no transfer/no hire policy.

(21) The Defendant's policy of not allowing transfers from one bargaining unit to another bargaining unit was unwritten, but has never been breached since it was instituted in 1971.

(22) In the six months following the closing of the Freedom Drive Plant, the Arrowood Plant hired 119 employees, 22.6% of whom were black.

(23) The policy of not hiring employees from one bargaining unit by another bargaining unit was not the result of an intent to discriminate because of race or color.

(24) The policy of not hiring employees from one bargaining unit by another bargaining unit did not have an adverse impact against blacks but against bargaining unit members, black and white.

(25) The Defendant's concern for maintaining its policy without exceptions was justified in view of the importance the union employees obviously placed on seniority in the contracts negotiated with the Company.

## DISCUSSION

■ The facts of this case present the novel question of whether a company policy against allowing transfers of members from one collective bargaining unit to another in the same company, and which policy affects 100% of the members of a particular bargaining unit composed of 15 blacks and one white; *i.e.*, 100% of the whites and 100% of the blacks, constitutes racial discrimination under Title VII, or 42 U.S.C.

Section 1981. This Court finds that on the facts and circumstances in this case it does not.

There is nothing in Title VII which mentions "disparate impact." However, as *Marbury v. Madison* lead the way for the Supreme Court to determine the constitutionality of Acts of Congress, so too was *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) the first in a long line of Supreme Court decisions to apply the disparate impact theory to discrimination cases. *Griggs* was followed by numerous cases refining the use of statistics in discrimination cases. Among them were *Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977); *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Connecticut v. Teal,* 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982); *Teamsters v. U.S.,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *New York City Transit Authority v. Beazer,* 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979); *Nashville Gas Co. v. Satty,* 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977).

Keeping in mind that statistical evidence is circumstantial in nature, we will now review those cases in relation to the facts and circumstances of the case at bar.

## PAST DISCRIMINATION—TESTING

In *Griggs* the Court cited Section 703 of the Civil Rights Act of 1964:

"Section 703(a). It shall be an unlawful employment practice for an employer—

\* \* \* \* \* \*

(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, *because* (emphasis added) of such individual's race, color, religion, sex, or national origin..."

In *Griggs* the Court said on 401 U.S. Page 430, 91 S.Ct. Page 853:

"Under the Act, practices, procedures, or tests, neutral on their face, and even

neutral in terms of intent, cannot be maintained *if they operate to "freeze" the status quo of prior discriminatory employment practices.* (emphasis added). The Court of Appeals' opinion, and the partial dissent, agreed that, on the record in the present case,

"whites register far better on the company's alternative requirements than Negroes." (Adding a footnote that in the North Carolina 1960 census statistics show that, while 34% of white males had completed high schoool, only 12% of Negro males had done so.) Continuing, the court said: "This consequence would appear to be directly traceable to race. Basic intelligence must have the means of articulation to manifest itself fairly in a testing process. Because they are Negroes, petitioners have long received inferior education in segregated schools and this court expressly recognized these differences in *Gaston County v. United States,* 395 U.S. 285 [89 S.Ct. 1720, 23 L.Ed.2d 309] (1969). There, because of the inferior education received by Negroes in North Carolina, this court barred the institution of a literacy test for voter registration on the ground that the test would abridge the right to vote indirectly on account of race ... Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed. What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate individually to discriminate on the basis of racial or other *impermissible* classification."

Thus, in *Griggs* the Court held that because of *past* discrimination in educational opportunities for Negroes, to require them to pass a facially neutral test would be discrimination *because* of their inability, due to the poor education Negroes had received in North Carolina, to articulate their basic intelligence. Obviously, this failure rate by Negroes as a result of *past* discrimination could be proven statistically to have an adverse impact on them and therefore unless the employer could show a

job related purpose for the test, the barrier must fall.

In summary, as the Court held in *Griggs,* at pp. 429–430, 91 S.Ct. at pp. 852–853

"The objective of Congress in the enactment of Title VII is plain from the statute. It was to achieve equality of employment opportunities and remove barriers that have operated *in the past* (emphasis added) to favor an identifiable group of white employees over other employees."

There is no evidence in this record to demonstrate that the statistically higher proportion of blacks in the small bargaining unit at the Freedom Drive Plant was because of past discrimination against blacks which caused them to be members of a union bargaining unit, and therefore, ineligible to apply for employment with another bargaining unit with the Defendant under its policy.

*Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) involved the use of two general ability tests. The Court there pointed out that the plant was organized into a number of functional departments, each with one or more distinct lines of progression, the theory being that workers can move up the line as they acquire the necessary skills. For many years, certain lines were themselves more skilled and paid higher wages than others, *and until 1964 these skilled lines were expressly reserved for white workers. Albemarle* used two general ability tests. Applicants for hire into various skilled lines of progression at the plant were required to score certain percentages on each of the two tests. There was no attempt to validate the tests for job relatedness. After 1964, when it discontinued overt segregation in the lines of progression, the Company allowed Negro workers to transfer to the skilled lines if they could pass the tests, but few succeeded in doing so. Incumbents in the skilled lines, some of whom had been hired before adoption of the tests, were not required to pass them to retain their jobs or their promotion rights. The

record showed that a number of white incumbents in high ranking job groups could not pass the tests. The District Court found that the petitioners had "strictly segregated" the plant's departmental lines of progression prior to January 1, 1964, reserving the higher paying and more skilled lines for whites. The racial identifiability of whole lines of progression persisted until 1968 when the lines were reorganized under a new collective bargaining agreement. The Court found, however, that this reorganization left Negro employees " 'locked' in the lower paying job classifications." The formerly "Negro" lines of progression had been merely tacked on to the bottom of the former "white" lines of progression, and promotions, demotions, and layoffs continued to be governed where skills were "relatively equal" by system of "job seniority." *Because of the plant's previous history of overt segregation,* only whites had seniority in the higher job categories. Discrimination was evident here, resulting from *past practices.*

There is no evidence in the record of the case at bar of a history of overt discrimination by the Defendant against blacks.

In *Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), the District Court and the Court of Appeals held that the employer had violated Title VII by engaging in a pattern and practice of employment discrimination against Negroes and Spanish surnamed Americans, and that the union had violated the Act by agreeing with the employer to create and maintain a seniority system that perpetuated the effects of *past racial* and ethnic discrimination. The Supreme Court vacated and remanded stating:

"Statistics are equally competent in proving employment discrimination.... We caution only that statistics are not irrefutable; they come in an infinite variety and, like any other kind of evidence, they may be rebutted. In short, their usefulness depends *on all the surrounding facts and circumstances* (emphasis added), citing, *Hester v. Southern R. Co.,* 497 F.2d 1374, 1379–81 (CA5).

"The seniority system in this litigation is entirely bonafide. It applies equally to all races and ethnic groups to the extent that it 'locks' employees into non linedriver jobs, it does so for all. The city drivers and servicemen who are discouraged from transferring to linedriver jobs are not all Negroes or Spanish surnamed Americans; to the contrary, the overwhelming majority are white." Pp. 355–356, 97 S.Ct. pp. 1864–1865.

In the case at bar, the Company policy "locks" *all* black *and all* white employees *who are members of a bargaining unit* into the "non-hire" policy of the Defendant, not just blacks.

### SEX DISCRIMINATION

There are a line of sex discrimination cases which further illustrate that surrounding circumstances are an important factor in deciding disparate impact cases, and that statistics alone do not decide the issue.

*Nashville Gas Co. v. Satty,* 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977), involved the petitioner's policy of denying employees returning from pregnancy leave their accumulated seniority. The Court held that the policy adversely affected their status as an employee *because* of their sex. The Court said on page 141: "It is beyond dispute that petitioner's policy of depriving employees returning from pregnancy leave of their accumulated seniority acts both to deprive them of employment opportunities and to adversely affect their status as an employee. It is apparent from the previous recitation of the events which occurred following respondent's return from pregnancy leave that petitioner's policy denied her specific employment opportunities that she otherwise would have obtained." Obviously, denying accumulated seniority to employees returning from pregnancy leave could only apply to women. There was discrimination therefore *because* they were women.

*Wright v. Olin Corp.,* 697 F.2d 1172 (4th Cir.1982) involved a fetal vulnerability policy literally expressed in gender—neutral

terms which had the obvious and indisputably intended consequence of imposing upon *women* workers a "substantial burden that men need not suffer". As the *Satty* Court (*Nashville Gas Co. v. Satty*, 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977) unhesitatingly applied disparate impact theory to the factual situation there presented, so should it be applied to the generally comparable situations in *Burwell v. Eastern Air Lines, Inc.*, 633 F.2d 361 (4th Cir.1980) *(en banc)* (mandatory pregnancy leave), *cert. denied*, 450 U.S. 965, 101 S.Ct. 1480, 67 L.Ed.2d 613; *Mitchell v. Board of Trustees of Pickens County School District A*, 599 F.2d 582 (4th Cir.1979) mandatory non-renewal for pregnancy; *Pennington v. Lexington School District 2*, 578 F.2d 546 (4th Cir.1978), denial of reinstatement following pregnancy leave). All of those cases involve policies having a disparate impact on a protected group which has a characteristic peculiar to that group's sex—pregnancy.

## STATISTICAL DISPARATE IMPACT

■ The disparate impact model applies only when an employer has instituted a specific procedure, usually a selection criteria for employment that can be shown to have a causal connection to a class based imbalance in the eligible applicants in this case. Thus, the disparate impact analysis may be used to challenge, for example, aptitude and intelligence tests, *Griggs, supra,* or height and weight requirements, *Dothard, supra,* or any policy which would circumscribe a class of persons characterized by some trait shared by the members of that class which is protected by Title VII.

■ In the case at bar the Plaintiffs have selected one small bargaining unit of the Defendant with 16 members and is asking the Court to hold that because 15 blacks and one white (100% black and 100% white members of bargaining unit) were affected by the Defendant's no hire/no transfer policy that the Court should find discrimination because of the statistically disparate impact on the blacks at the one

bargaining unit at the Freedom Drive Plant. In no case should there be blind adherence to the position that mere statistical imbalance equals discrimination. *Olson v. Philco Ford,* 531 F.2d 474 (10th Cir.1976) abd *Keyes v. Lenoir Rhyne,* 552 F.2d 579, (4th Cir.1977) *cert. denied,* 434 U.S. 904, 98 S.Ct. 300, 54 L.Ed.2d 190. *Morris, Current Trends in the Use (and Misuse) of Statistics in Employment Discrimination Litigation* Second Edition 1979 Equal Employment Advisory Council, P. 51.

In *EEOC v. Federal Reserve Bank of Richmond,* 698 F.2d 633 (4th Cir.1983), quoting from *Pope v. City of Hickory, North Carolina,* 679 F.2d 20, 22 (4th Cir. 1982) the Court said:

"The disparate impact model applies *only* (emphasis added) when an employer has instituted a specific procedure, usually a selection criteria for employment (such as an aptitude or intelligence test, or height and weight requirements) *that can be shown to have a causal connection to a class based imbalance in the (employer's) work force* (emphasis added) and has been said not to be the appropriate vehicle from which to launch a wide ranging attack on the cumulative effect of a company's employment practices. *Pouncy v. Prudential Ins. Co. of America,* 668 F.2d 795, 800 (5th Cir. 1982).

"It is obvious that the Plaintiffs are not complaining in the case at bar of some employment practice or procedure of the Defendant which, though neutral or fair on its face, has a discriminatory impact on blacks only, and thus the Plaintiffs' case does not fit within the disparate impact claim."

The disparate impact of Defendant's policy is on union members. Membership in union is not limited to blacks, nor is the union membership the result of past discrimination as is an inferior education, *Gaston County v. United States,* 395 U.S. 285, 89 S.Ct. 1720, 23 L.Ed.2d 309 (1969). Neither is the Defendant's policy against hiring members of one bargaining unit in another bargaining unit applied only to

blacks, nor is there any evidence that there is a causal connection between the Company's policy and *blacks* being denied employment.

There was no evidence whatsoever in the case at bar of any physical requirement with respect to height, as in *Dothard v. Rawlinson*, 433 U.S. 321, 324, 97 S.Ct. 2720, 2724, 53 L.Ed.2d 786 (1977) or a high school diploma, as in *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) or a minimum passing score on an aptitude test, as in *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 and *Connecticut v. Teal*, 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982).

In *EEOC v. Federal Reserve, supra,* the Court said at Page 646:

"... to sum up, statistical evidence *is circumstantial in character* (emphasis added) and its acceptability depends on the magnitude of the disparity it reflects, the relevance of its supporting data, *and other circumstances in the case supportive of or in rebuttal of a hypothesis of discrimination.* (Emphasis added). And, in reviewing statistical evidence, and its supporting data, the Court must give consideration and evaluate fairly such conflicting opinions and hypothesis as may have been presented, tempering its conclusion with what one court has described as a 'pinch of common sense.' *Otero v. Mesa City Valley School District No. 51,* 470 F.Supp. [326] at 335 [ (1979) ]. *EEOC v. Federal Reserve Bank of Richmond, supra* at pp. 646 and 647."

After all the technical statistical jargon like "one tail" or "two tail" tests and Chi-Square test (Yates corrected) are placed before the trial judge, it is his job to resolve the issues.

*Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977) involved a female's class action suit against appellant correction officials challenging statutory height and weight requirements and a regulation establishing gender criteria for assigning correctional counselors to contact positions. On the basis of national statistics as to the comparative height and weight of men and women indicating that Alabama's statutory standards would exceed over 40% of the female population but less than 1% of the male population, the Court found that with respect to such standards appellee had made out a *prima facie* case of unlawful sex discrimination, which appellants had failed to rebut. Women have certain physical characteristics which would preclude them from overcoming the requirements of the Defendant in *Dothard.* Obviously, this type of statistical evidence is distinguishable from what the Plaintiffs in the case at bar are trying to prove; *i.e.,* Defendant's no transfer/no hire policy which would prevent any employee of a bargaining unit from transferring to another bargaining unit has a disparate impact on blacks. The Plaintiffs have produced no statistics common to union members which would show a disparate impact on blacks, as a result of Defendant's no transfer/no hire policy.

As the Plaintiffs contend, the factor to be considered is not the facial neutrality of the policy, it is the impact of the policy. The Plaintiffs' problem is that the impact of the Defendant's policy here is adverse to all union members of all bargaining units of the Defendant, both white and black, not simply to blacks. There is nothing in the Defendant's policy which would circumscribe a class of persons characterized by some trait and therefore it is of no significance in determining discrimination.

The Plaintiff Jones on Page 18 of his Post-Trial Brief points to statistics showing 5,410,699 blacks in bargaining units and 35,372,042 whites who are members of bargaining units nation wide and 180,212 blacks and 566,178 whites who are members of bargaining units state wide (North Carolina). The Plaintiff Jones' brief states on the same page: "... the application of the defendant's policy to the national and state workforces would result in fewer blacks being eligible to apply at another unit in a statistically significant manner." These statistics and the Plaintiff Jones'

contention that application of Defendant's policy to the national (and State) workforces would result in fewer blacks being eligible to apply at another unit in a statistically significant manner reinforces the principle there should not be blind adherence to the position that mere statistical imbalance equals discrimination. The Plaintiffs are, in other words, complaining that fewer blacks would be adversely affected by the Defendant's policy statewide and nationally, and on the other hand by selecting this one small bargaining unit in the case at bar, the Plaintiffs contend that because more blacks than whites are affected by the Defendant's policy as to the one small bargaining unit involved in this case that they have satisfied the *prima facie* proof of adverse impact against blacks in the case at bar. Furthermore, not all former union members are barred by Defendant's policy—only those who worked for the Defendant in another bargaining unit.

In the case at bar, the system of nohire/nontransfer operated to disqualify *all* bargaining unit employees of the Defendant equally from transferring between seniority units. The system was facially neutral and was applied equally to all races, black and white.

The union agreements with each bargaining unit have not been shown by the Plaintiffs to be related in any manner to race. Simply because substantially all hourly employees of the one small Freedom Drive Plant bargaining unit were black, it cannot be said there was evidence of *past* discrimination.

There is no evidence that the seniority system bargained for by the Company in each bargaining unit was in any way the result of racially discriminatory policies or practices. On the contrary, the seniority system was the result of each union's collective bargaining with the Defendant employer.

The Company's policy has been in effect since 1971. The Plaintiff's were members of a bargaining unit where the Company had hired blacks in a 15 to 1 ratio. Simply because the Company has employed an al-most completely black work force in one locality, the employer should not now be found to have discriminated against the Plaintiffs because of a policy affecting all union applicants who had been members of other bargaining units of the Company. If substantially all the employees of a particular bargaining unit are black, then it does not require an expert in statistics to show an adverse impact on union members, black and white, if none of the employees of that particular bargaining unit were eligible for reemployment in another bargaining unit of the Company. But, the adverse impact is on all union members, black and white in all bargaining units. The Plaintiffs conceded that *not one white* from another union bargaining unit was ever re-employed and the evidence is that the policy has been strictly enforced and has never been breached.

The employment practice here is not discriminatory as to blacks. If anything, the practice is discriminatory as to *membership of the Union*, both black and white. It is the bargaining unit employees who are prohibited from transferring and that has no reference to their color. It just so happens that in this one particular *small* bargaining unit, there were substantially more negroes hired by the Defendant than there were whites.

Another question, of course, is should the statistical analysis, as contended by the Plaintiffs, be applied only to the bargaining unit of which the Plaintiffs were members, or should the Court consider all employees of the Company affected by the policy on the closing of the plants in November 1982? This Court is of the opinion that *all* members of a group who were affected by the policy, not just those in one isolated bargaining unit, should be considered in determining the statistical significance of the Company's policy. Then of the 1,037 employees who were laid off and who were prevented from being rehired only 17% were black and 83% were white. (Finding of Fact No. 16). Thus, there would be no statistically significant ratio of blacks affected by the Company's policy. The Plain-

tiffs have taken a little over 1% of the employees of the Defendant affected by the policy in question as a result of the plant closings and presented a distorted picture of the statistically disparate impact on blacks. To give credence to the statistical sample used by the Plaintiffs would penalize the Defendant for hiring blacks in numbers in this particular unit far exceeding the relative work force of blacks and whites in North Carolina (See Defendant's Exhibit 1).

In the case at bar, the policy complained of was applicable to *all* bargaining unit employees of the Company, including the other six which were closed, not just to the employees in the Freedom Drive Plant. It affected directly the 22 whites from other bargaining units who applied as well as the three black Plaintiffs and both the 3 black Plaintiffs and the 22 whites who applied were denied employment. The policy was not arbitrarily applied to the employees of the bargaining unit where the Plaintiffs were employed at the moment they were terminated, but was a company-wide policy which had been in effect since 1971. There was no selection of the one bargaining unit where the 15 blacks were employed to apply the policy and the blacks who are Plaintiffs in this action were not treated any differently than the whites from other bargaining units who applied.

■ Finally, proof of adverse impact in employment is a necessary element of every disparate impact case. Employers are not required to justify every employment practice or qualification. It is only after the Plaintiffs have made a *prima facie* showing of discrimination that the employer is required to go forward with evidence to justify the practice as job related and racially neutral; *i.e.*, when the employer selects applicants for hire or promotion in a racial pattern significantly different from that of the pool of applicants. *Equal Employment Opportunity v. Greyhound Lines*, 635 F.2d 188 (3rd Cir.1980).

*All* employees in the case at bar *who were members of all union bargaining units* were treated the same whenever they applied at another bargaining unit of the Defendant, whatever their sex, race, ethnic origin, or religion. Title VII does not extend its coverage to discrimination against union members.

In conclusion, the Plaintiffs have demonstrated to this Court that in the small bargaining unit in which the Plaintiffs were employed there were 16 employees, 15 blacks and one white which obviously would statistically show a racial imbalance when the Company policy of no hire/no transfer is applied to that one bargaining unit. In short, the Plaintiffs have shown that the employees, 100% white and 100% black, of one bargaining unit could not obtain employment at another bargaining unit plant because of the Defendant's no hire/transfer policy, but, neither could employees, both black and white, from other bargaining units of the Defendant. The Plaintiffs are now asking this Court to find discrimination by Defendant as a result of a business policy of the Defendant as to union members in existence since 1971. The Plaintiffs concede they have not found a breach of that policy. There is not any evidence the Plaintiffs have been treated any differently than white employees under either the disparate treatment theory or disparate impact theory. The Plaintiffs in this case have failed to show:

(1) Purposeful racial discrimination by the Defendant;

(2) Past discrimination by the Defendant;

(3) Aptitude or intelligence tests which caused the imbalance in the Defendant's work force in favor of whites;

(4) Height or weight requirements which was favorable to whites;

(5) High school diploma or other educational requirements;

(6) Any other requirement or policy by the Defendant which has a *causal* connection with the rejection of the Plaintiffs' applications for employment in the Arrowood Plant *because of race*; and

(7) Finally, the statistics in this case are not sufficient circumstantial evidence

of adverse impact by the Defendant's policy against a protected group, since union members are not a "protected group", under Title VII.

## CONCLUSIONS OF LAW

The Plaintiffs have failed to make a *prima facie* case of racial discrimination under Title VII, or 42 U.S.C. Section 1981.

The Court will enter judgment for the Defendant.